1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  ROBERT L. MUKAI
   Senior Assistant Attorney General
3  SARA J. DRAKE
   Supervising Deputy Attorney General
4  RANDALL A. PINAL, State Bar No. 192199
   Deputy Attorney General
5  PETER H. KAUFMAN, State Bar No. 52038
   Deputy Attorney General
6  110 West A Street, Suite 1100
   San Diego, CA 92101
7  P.O. Box 85266
   San Diego, CA 92186-5266
8  Telephone: (619) 645-2020
   Fax: (619) 645-2012
9  Email: peter.kaufman@doj.ca.gov

10 Attorneys for Defendant the California Gambling
   Control Commission

11

**ORIGINAL**
FILED

2008 JAN 22  PM 3: 29

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

12              IN THE UNITED STATES DISTRICT COURT

13              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15  **CALIFORNIA VALLEY MIWOK TRIBE,** | Case No. **08 CV 0120 BEN AJB** |
| 16                                Plaintiff, | |
| 17            **v.** | State Court No. 37-2008-00075326-CU-CO-CTL |
| 18  **THE CALIFORNIA GAMBLING CONTROL COMMISSION; and DOES 1 THROUGH 50, Inclusive,** | NOTICE OF REMOVAL OF CIVIL ACTION |
| 19 | |
| 20                                Defendants. | 28 U.S.C. § 1446(a) |

21

22  **NOTICE OF REMOVAL** To the honorable judges of the United States District Court for the

23  Southern District of California:

24       Removing party, the California Gambling Control Commission, by the undersigned attorney,

25  respectfully shows this Court:

26       1.     Removing party is a defendant in the above-entitled action.

27       2.     On January 8, 2008, the above-entitled action was commenced against removing party

28  in the Superior Court of the State of California for the County of San Diego and is pending in that

1

1    court.

2        3.    On January 11, 2008, removing party was served by courier with a summons and

3    complaint at its offices at 2399 Gateway Oaks Drive, Suite 100, Sacramento, Sacramento County,

4    California. This notice is filed within thirty days after such service.

5        4.    The amount in controversy in the above-entitled action exceeds three million dollars.

6        5.    Defendant is entitled to removal of the above-entitled action because this Court has

7    original jurisdiction of the subject matter of the suit. The suit alleges a breach of the terms of tribal-

8    state class III gaming compacts entered into between the State of California and sixty-one federally-

9    recognized Indian tribes pursuant to the provisions of the Indian Gaming Regulatory Act, 25 U.S.C.

10   § 2701 et seq. ("IGRA") and plaintiff seeks payment of fees it claims are due and owing under the

11   terms of those compacts, as well as compensatory damages. In *Cabazon Band of Mission Indians

12   v. Wilson,* 124 F.3d 1050, 1055-56 (9th Cir. 1997)— a case in which the plaintiff tribe was, likewise,

13   seeking the payment of monies claimed were due it under the terms of a compact—the court held that

14   federal district courts have subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362 over

15   suits to enforce the terms of tribal-state class III gaming compacts because such compacts are not

16   only a creation of federal law but agreements whose terms are controlled by the provisions of a

17   federal law (IGRA). *Cabazon Band of Mission Indians v. Wilson,* 124 F.3d at 1056.[1]

18       6.    Copies of all process, pleadings, and orders served on removing party in the above-

19   entitled action are attached hereto as Exhibits 1 through 4, inclusive.

20   / / /

21   / / /

22   / / /

23

24

---

25       1. While the State of California has waived its Eleventh Amendment immunity from suits
26   for breach of a tribal-state class III gaming compact in California Government Code section 98005,
     it has not waived its Eleventh Amendment immunity from suits that are not permitted by that
27   compact, including but not limited to suits for damages, compensatory or otherwise or suits by tribes
     that are not signatories to the compact. Nothing in this Notice of Removal constitutes a waiver of
28   the State's Eleventh Amendment immunity from suits that are not authorized by a tribal-state class
     III gaming compact that is duly executed, ratified and approved by the Secretary of the Interior.

1          WHEREFORE, removing party respectfully requests that the above-entitled action be

2    removed from the Superior Court of the State of California for the County of San Diego to this Court.

3

4          Dated:  January 22, 2008

5                                    Respectfully submitted,

6                                    EDMUND G. BROWN JR.
                                     Attorney General of the State of California

7                                    ROBERT L. MUKAI
                                     Senior Assistant Attorney General

8                                    SARA J. DRAKE
                                     Supervising Deputy Attorney General

9

10                                   RANDALL PINAL
                                     Deputy Attorney General

11

12

13                                   PETER H. KAUFMAN
                                     Deputy Attorney General
14                                   Attorneys for Defendant California Gambling Control
                                     Commission

15    80198647.wpd

16    SA2008300115

17

18

19

20

21

22

23

24

25

26

27

28

                                          3

# Table of Contents

| Exhibit No. | Document | Pages |
|---|---|---|
| 1 | Complaint for Injunctive Relief; Declaratory Relief; Breach of Contract; Breach of Fiduciary Duty; Intentional Interference with Prospective Economic Advantage | 1-63 |
| 2 | Summons | 64 |
| 3 | Civil Cover Sheet | 65 |
| 4 | Notice of Case Assignment | 66 |

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

AVERY™

**EXHIBIT 1**

1   Manuel Corrales, Jr., Esq. SBN 117647
    **Attorney at Law**
2   11753 Avenida Sivrita
    San Diego, CA 92128
3   Phone:  (858) 521-0634
    Fax:  (858) 521-0633
4
    Attorney for Plaintiff
5    CALIFORNIA VALLEY MIWOK TRIBE

6

7

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           FOR THE COUNTY OF SAN DIEGO – CENTRAL DISTRICT

10

11  CALIFORNIA VALLEY MIWOK TRIBE,      Case No.    37-2008-00075326-CU-CO-CTL

12          Plaintiff,                  COMPLAINT FOR:

13      v.                              1.    **INJUNCTIVE  RELIEF**
                                        2.    **DECLARATORY RELIEF**
14  THE CALIFORNIA GAMBLING             3.    **BREACH OF CONTRACT**
    CONTROL COMMISSION; and DOES        4.    **BREACH OF FIDUCIARY DUTY**
15  1 THROUGH 50, Inclusive,            5.    **INTENTIONAL INTERFERENCE**
                                        **WITH PROSPECTIVE ECONOMIC**
16          Defendants.                 **ADVANTAGE**

17

18

19

20

21

22

23

24

25          Plaintiff alleges as follows:

26                          **PARTIES**

27  1.    Plaintiff CALIFORNIA VALLEY MIWOK TRIBE ("MIWOK TRIBE" or

                **COMPLAINT FOR INJUNCTIVE RELIEF, ETC.**
28

                                                        000001

1    "PLAINTIFF") is a federally recognized Indian Tribe situated in Stockton, California.

2    2.    Defendant CALIFORNIA GAMBLING CONTROL COMMISSION ("The

3    Commission") was created by enactment of Senate Bill 8 (Lockyer, Chapter 867,

4    Statutes of 1997), a measure that created the Gambling Control Act.  The Commission

5    has jurisdiction over operation, concentration, and supervision of gambling

6    establishments and over all persons or things having to do with the operations of

7    gambling establishments in the State of California.  In addition, The Commission

8    serves as Trustee and/or Administrator of various funds in the State Treasury,

9    including the Gambling Control Fund established in the Gambling Control Act, the

10   Indian Gaming Revenue Sharing Trust Fund ("RSTF"), and the Indian Gaming Special

11   Distribution Fund ("SDF").

12   3.    Plaintiff is ignorant of the true names and capacities of the defendants named

13   herein as DOES, and will seek leave of court to amend the complaint to set forth their

14   true names when ascertained.

15   **VENUE**

16   4.    Pursuant to Cal. Bus. & Prof. Code section 19807, venue is established in San

17   Diego County, California.

18   **GENERAL ALLEGATIONS**

19   5.    In September of 1999, the State of California ("the State") entered into a "Tribal-

20   State Gambling Compact" ("Compact") with various Indian Tribes in the State, which

21   enabled these Tribes to conduct gambling operations and build gambling casinos for

22   that purpose.  A copy of this Compact is attached and marked as Exhibit "1".  In

23   exchange, these Compact Tribes are required to contribute a percentage of their

24   winnings to the RSTF and SDF.

25   6.    At all times herein mentioned, the Miwok Tribe is and was a non-compact Tribe

26   with no casinos or gambling operations.  As a result, it qualifies as a recipient of funds

27   from the RSTF.  The Commission, as Trustee of the RSTF, distributes the monies

28   received into the RSTF on a quarterly basis to non-compact Tribes, such as the Miwok

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                          Page 2

1   Tribe. Recipient Tribes, including the Miwok Tribe, are entitled to receive up to $1.1

2   million per year from the RSTF. Section 4.3.2.1(a) of Compact. If the RSTF does not

3   have sufficient funds to pay the non-compact Tribe $1.1 million per year, Cal. Gov.

4   Code § 12012.90(d) requires The Commission to take funds from the SDF to make up

5   any shortfall, and do so "without delay to eligible recipient Indian Tribes ...".

6   7.    At all times herein mentioned, the Miwok Tribe was and is <u>eligible</u> to receive

7   funds from the RSTF and shortfall funds from the SDF, so as to be given its entitled

8   $1.1 million per year pursuant to Section 4.3.2.1(a) of the Compact and Cal. Gov. Code

9   §§ 12012.75 and 12012.90.

10   8.    In 1994, Congress entacted the Federally Recognized Tribe List Act of 1994,

11   Pub. La 103-454, and the Miwok Tribe's name was placed on the list of federally

12   recognized tribes. In 1998, the Miwok Tribe established a tribal council, by Resolution

13   No. GC-98-01. On June 25, 1999, the Bureau of Indian Affairs ("BIA") recognized Silva

14   Burley ("Burley") of the Miwok Tribe as tribal chairperson.

15   9.    In late 1999, a leadership dispute developed within the Miwok Tribe. On July 12,

16   2000, the BIA again recognized Burley as chairperson of the Miwok Tribe, amid the

17   Miwok Tribe's efforts to have the BIA approve its constitution, and the Miwok Tribe's

18   ongoing internal leadership disputes.

19   10.   In September 2001, the Miwok Tribe adopted a new version of its constitution,

20   and sent it to the BIA for approval. On October 31, 2001, the BIA declined to approve

21   the proposed new constitution, but recognized the Miwok Tribe as an "unorganized

22   Tribe".

23   11.   In November of 2003, the BIA acknowledged the existence of a "government-to-

24   government relationship" with the Miwok Tribe through the tribal council that Burley

25   chaired.

26   12.   On March 26, 2004, the BIA advised the Miwok Tribe that it still considered the

27   tribe to be unorganized, despite the passage of the Native American Technical

28   Corrections Act of 2004, giving Tribes the power to adopt governing documents of their

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 3

1   own. In the letter, the BIA asked the Miwok Tribe to draft a constitution that identified

2   more of its membership base. Nevertheless, the letter still recognized Burley as "a

3   person of authority" with respect to the Miwok Tribe.

4   13.    In March 2005, the BIA met with the Miwok Tribe in an effort to resolve the tribe's

5   ongoing leadership disputes.

6   14.    The BIA has continued to recognize the Miwok Tribe only as an "unorganized"

7   tribe, because it has not adopted a governing constitution that identified other putative

8   members of the tribe. It also will only recognize Burley as a "person of authority" for

9   the Miwok Tribe, rather than its tribal chairperson.

10   15.    Because of the ongoing Miwok tribal leadership dispute and the BIA's decision to

11   recognize the Miwok Tribe as "unorganized" and Burley as merely a "person of

12   authority", The Commission notified the Miwok Tribe in August of 2005, that it would be

13   withholding distributions from the RSTF. The Commission advised it would be doing

14   so, until the Miwok Tribe's leadership was formally established.

15   16.    Despite repeated requests that The Commission distribute to the Miwok Tribe its

16   share of funds under the RSTF, The Commission has refused and continues to refuse

17   to do so.

18   17.    In 2005, the Miwok Tribe filed suit in the U.S. District Court in Washington, D.C.,

19   seeking declaratory and injunctive relief against the BIA. The complaint alleged the

20   BIA was interfering with the Miwok Tribe's internal affairs by refusing to permit it to

21   adopt its own constitution. The District Court dismissed the complaint as failing to state

22   a claim, because under 25 U.S.C. § 476(h), the BIA can still require the tribe to

23   organize its tribe so as to identify and include all putative mandates. There was no

24   decision in the merits of whether the Miwok Tribe was "organized" or a recognized

25   Tribe. The decision is presently on appeal. Despite this, The Commission has

26   erroneously interpreted the District Court's Decision as a decision on the merits of

27   these issues, and has wrongfully asserted that as an additional basis to withhold

28   distribution of money to the Miwok Tribe from the RSTF.

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 4

18.    Pursuant to Cal. Gov. Code § 12012.75, The Commission has a mandatory duty to distribute funds from the RSTF to the Miwok Tribe, and under Section 4.3.2.1(b) it has no discretion in deciding whether a non-compact Tribe is entitled to such funding. On December 21, Plaintiff made written demand for its RSTF money.  On January 3, 2008, The Commission refused to distribute as demanded, for the reasons set forth herein.  It advised the total amount withheld as of September 30, 2007, was $3,121,397.76.

## FIRST CAUSE OF ACTION

### (Injunctive Relief Against Defendant

### The California Gambling Control Commission and DOES 1-10)

19.    The allegations in paragraphs 1 through 18 are realleged and incorporated herein by reference.

20.    At all times herein mentioned, Cal. Gov. Code Section 12012.75 was and is in full force and effect.  It states that The Commission has a mandatory duty to distribute RSTF payments to non-compact Tribes such as the Miwok Tribe.  It provides:

> There is hereby created in the State Treasury a special fund called the "Indian Gaming Revenue Sharing Trust Fund" for the receipt and deposit of moneys derived from gaming device license fees that are paid into the fund pursuant to the terms of tribal-state gaming compacts for the purpose of making distributions to noncompact tribes.  Moneys in the Indian Gaming Revenue Sharing Trust Fund shall be available to the California Gambling Control Commission, upon appropriation by the Legislature, for the purpose of making distributions to noncompact tribes, in accordance with distribution plans specified in tribal-state gaming compacts. (Emphasis added.)

As stated, Cal. Gov. Code Section 12012.75 requires The Commission to distribute RSTF payments in accordance with the terms of the Compact.

21.    Section 4.3.2.1(a) provides that non-compact tribes are to receive $1.1 million per year from the RSTF.  It states in relevant part as follows:

> The Tribe agrees with all other Compact Tribes that are parties to compacts having this Section 4.3.2, that each Non-Compact Tribe in the State shall receive the sum of $1.1

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 5

million per year ...

Section 4.3.2.1(a) further provides that if there is not enough money in the RSTF to pay each non-compact tribe $1.1 million per year, then the funds are to be distributed in equal shares. However, Cal. Gov. Code Section 12012.90(d) requires The Commission to take funds from the SDF to make up any shortfall, and that The Commission "shall distribute [such] moneys without delay to eligible recipient Indian Tribes ...".

22.    Under the Compact, the RSTF payments are to be made quarterly, and The Commission is to be a <u>trustee</u> of these funds for distribution purposes, having <u>no discretion</u> on whether to disburse the funds or how much each tribe is to receive. Section 4.3.2.1(b) provides in pertinent part as follows:

> ... The Commission shall have <u>no discretion</u> with respect to the use or disbursement of the trust funds. Its sole authority shall be to serve as a depository of the trust funds and to disburse them on a quarterly basis to Non-Compact Tribes....

23.    Despite these clear statutory and Compact requirements, The Commission has taken it upon itself, wrongfully, to withhold RSTF money to the Miwok Tribe because it is not "organized". Under Section 4.3.2.s(b), The Commission has <u>no discretion</u> to make that determination. Moreover, nowhere in the Compact is there any requirement that a Non-Compact Tribe be "organized" in order to be entitled to distribution payments under the RSTF. To the contrary, all that the Compact requires is that the Non-Compact Tribe be "recognized", either formally or informally, to be eligible for payment. For example, Section 2.12 of the Compact states:

> "Tribe" means a federally-recognized Indian tribe, <u>or an authorized official</u> or agency thereof. (Emphasis added.)

24.    Despite the disputes involving the Miwok Tribe's leadership, the BIA has recognized, and continues to recognize, Burley as a 'person of authority", and the Miwok Tribe as an "unorganized Tribe". The language of Section 2.21 o the Compact

---

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 6

1   requires only that the Tribe be federally recognized, not necessarily "organized". The

2   BIA has to date never stated that the Miwok Tribe was no longer recognized, or that

3   Burley is no longer a "person of authority".

4   25.   Accordingly, the plaintiff is entitled to continued distribution of moneys under the

5   RSTF, and The Commission's decision to withhold such funds is wrongful, an abuse of

6   its powers, and a breach of its fiduciary duties. The Commission's decision to withhold

7   such funds is based in part on its erroneous interpretation of the U.S. District Court

8   Decision in *California Valley Miwok Tribe v. The United States* (D.D.C. 2006) 424

9   F.Supp.2d 197, which made no ruling on the merits of the Miwok Tribe's entitlement to

10  RSTF money in California, or The Commission's fiduciary duties to distribute those

11  funds to plaintiff. Indeed, The Commission was not a party to that action.

12  26.   To date, The Commission has wrongfully withheld from the Miwok Tribe over $3

13  million in RSTF money.

14  27.   Plaintiff has repeatedly requested and demanded that The Commission distribute

15  such sums to Plaintiff, but The Commission has refused.

16  28.   Plaintiff has no adequate remedy at law.

17  29.   Grounds exist for injunctive relief under CCP § 526(a)(7), because the requested

18  relief involves an obligation arising from a trust. The RSTF is a "trust" fund, and The

19  Commission is contractually and statutorily designated to "serve as the trustee of the

20  fund." Section 4.3.2.1(b) of Compact.

21  30.   Accordingly, Plaintiff requests the court order The Commission to discharge its

22  fiduciary and mandatory, statutory duties, and distribute to the Plaintiff its entitled share

23  of funds under the RSTF as herein alleged.

24              **SECOND CAUSE OF ACTION**

25           **(Declaratory Relief as Against Defendant The**

26      **California Gambling Control Commission and DOES 1-10)**

27  31.   The allegations in paragraphs 1 through 30 are realleged and incorporated

28  herein by reference.

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.              Page 7

32.    An actual controversy has arisen and now exists between Plaintiff and

Defendants concerning defendant Commission's (and relevant DOE defendants')

obligations under the Compact and under the California Government Code, including,

but not limited to, Cal. Gov. Code Section 12012.75 and Cal. Gov. Code Section

12012.90(d), and other statutes and regulations, to distribute moneys to Plaintiff under

the RSTF, and Plaintiff's entitlement to such money. CCP § 1060. The dispute

requiring judicial determination under CCP § 1060, includes, but is not limited to The

Commission's decision to withhold such funding, because Plaintiff is purportedly not an

"organized" tribe. Plaintiff dispute The Commission's decision, and contends that The

Commission has no discretion to withhold the RSTF moneys on such grounds, and

alleges that it is entitled to RSTF payments, because the BIA still recognizes it as an

"unorganized" tribe and still recognizes Silvia Burley, a tribal member, as an authorized

representative of the Miwok Tribe.

33.    At all times herein mentioned, the Miwok Tribe was and is a third party

beneficiary under the Compact with respect to the RSTF payments, and with respect to

the SDF for shared full payments into the RSTF. Section 4.3.2.1(a)(1) states in

pertinent part as follows:

> (a)    For the purposes of this Section 4.3.2.1(b).3.2 and
> section 5.0, the following definitions apply:
>
> (i)    In Non-Compact Tribes shall be deemed
> third party beneficiaries of this and other
> compacts identical in all material
> respects ...

34.    CCP Section 1060 provides in pertinent part as follows:

> Any person interested under a written instrument ... or under
> a contract, or who desires a declaration of his or her rights or
> duties with respect to another, ... may, in cases of actual
> controversy relating to the legal rights and duties of the
> respective parties, bring an original action ... in the superior
> court for a declaration of his or her rights and duties ...,
> including a determination of any question of construction or
> validity arising under the instrument or contract ...
> (Emphasis added.)

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 8

As a third party beneficiary under the Compact, Plaintiff Miwok Tribe is a "person interested under a written instrument … or under a contract …". The Compact is a written instrument or "contract". Pursuant to CCP § 1060, the Plaintiff seeks a judicial declaration of its rights under the Compact with respect to RSTF payments, and The Commission duties as a "trustee" of the RSTF to make payments to Plaintiff. Plaintiff further seeks a determination of a proper construction of Section 4.3.2.1, including, but not limited to, the phrase: "The Commission shall have no discretion with respect to the use or disbursement of the trust funds [RSTF]." The Commission contends that it can withhold RSTF payment from the Miwok Tribe because it is "unorganized". Plaintiff disputes this, and contends that The Commission has made RSTF payments to it in the past when it was purportedly not "organized". Plaintiff contends The Commission has no discretion to suddenly stop making payments, because the Minok Tribe has an ongoing tribal leadership dispute. Plaintiff further contends that The Commission has no discretion to withhold RSTF payment based on The Commission's interpretation of an unrelated U.S. District Court Decision between the Plaintiff and the BIA. In any event, Plaintiff contends The Commission's interpretation of that Decision is erroneous. Plaintiff contends The Commission has breached its fiduciary duties under the Compact by wrongfully withholding Plaintiff's entitled share of RSTF payments. The Commission disputes Plaintiff's claims and contends it has a right to withhold RSTF payments because Plaintiff is not an "organized" tribe. Plaintiff contends, however, that the Compact does not require Plaintiff to be "organized", just recognized through an "authorized representative". (Section 2.21 of the Compact.) Plaintiff contends that the BIA has recognized Barley as an "authorized representative" of the Miwok Tribe while it has been "unorganized", and that the Compact requires nothing more for entitlement to RSTF payments.

35.   Plaintiff contends The Commission has wrongfully withheld, to date, over $3 million, and desires a judicial determination that The Commission pay these withheld

1    funds forthwith to the Miwok Tribe via its authorized representative, Silvia Burley.

2    36.    Plaintiff desires a judicial determination and declaration of Plaintiff's and The

3    Commission's (and relevant DOE defendants) rights and duties under the Compact

4    and relevant state law, including a proper and correct interpretation of the Compact

5    and relevant Cal. Gov. Code Sections and other statutory questions.

6    ### THIRD CAUSE OF ACTION

7    **(Breach of Contract As Against Defendant The**

8    **California Gambling Control Commission and DOES 11-20)**

9    37.    The allegations in paragraphs 1 through 36 are realleged and incorporated

10   herein by reference.

11   38.    At all times herein mentioned, Plaintiff was and is a third party beneficiary under

12   the Compact, specifically as it pertains to RSTF payments.  (Section 4.3.2.(a)(1)).

13   39.    Defendant Commission (and relevant DOE defendants) breached the express

14   terms of the Compact, by refusing to pay to Plaintiff money owed from the RSTF.

15   40.    At all times herein mentioned, Plaintiff was, and is, entitled to distribution of

16   RSTF payments.

17   41.    At all times herein mentioned, Plaintiff performed all the conditions and duties

18   required of it under the Compact, so as to be eligible for receipt of RSTF money.

19   42.    At no time was The Commission excused from performance, or was performance

20   under the Compact frustrated or prevented.

21   43.    As a result of defendant Commission's (and relevant DOE defendants') breach of

22   contract, Plaintiff suffered damages, including, but not limited to loss of RSTF money

23   and interest thereon.

24   44.    Plaintiff makes no claim against any of the Compact Tribes, and as such, they

25   are not necessary and indispensible parties.

26   45.    Sovereign immunity has been specifically waived under Section 9.4 of the

27   Compact, for purposes of collecting the funds due Plaintiff by The Commission under

28   the RSTF.

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 10

1   ///

2   ///

3                           **FOURTH CAUSE OF ACTION**

4                  **(Breach of Fiduciary Duty as Against Defendant the**

5                  **California Gambling Control Commission and DOES 11-20)**

6       46.    The allegations in paragraphs 1 through 45 and realleged and incorporated

7   herein by reference.

8       47.    The Commission's (and that of relevant DOE defendants') conduct as herein

9   alleged constitutes a breach of its (and/or their) fiduciary duties under the Compact and

10  under State law.

11      48.    As a result of The Commission's (and that of relevant DOE defendants') breach

12  of fiduciary duties, Plaintiff suffered damages as herein alleged, including loss of RSTF

13  payments exceeding $3 million.

14                          **FIFTH CAUSE OF ACTION**

15              **(Intentional Interference With Prospective Economic**

16                  **Advantage, As Against DOES 21-50)**

17      49.    The allegations in paragraphs 1 through 48 are realleged and incorporated

18  herein by reference.

19      50.    Upon information and belief, DOE defendants 21-50 have conspired with one

20  another to take over the Miwok Tribe, so they can build and operate a casino in its

21  name. To accomplish this, DOE defendants 21-50 have stirred up strife and contention

22  amid the Miwok Tribe leadership, making it difficult for the tribe to form an organized

23  constitution. This faction of conspirators have wrongfully influenced and persuaded

24  The Commission to withhold funding, because the Miwok Tribe is not "organized".

25  DOE defendants 21-50, upon further information and belief, have attacked the Miwok

26  Tribe's legitimacy through the BIA, hoping to form a coalition against Plaintiff to stop

27  funding and destroy the tribe as a constituted Native American Indian Tribe. By doing

28  so, this faction of conspirators hope to take over the tribe and build and operate a tribal

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 11

1  casino for profit.

2  51.    Accordingly, The Commission's decision to stop RSTF payments to Plaintiff is a

3  byproduct of the efforts of DOE defendants 21-50 to take over the tribe.

4  52.    The actions of DOE defendants 21-50 were and are intentional, and have been,

5  and are, calculated to interfere with Plaintiff's rights and entitlement to distribution

6  payments under the RSTF.  DOE defendants 21-50 have intentionally interfered with

7  Plaintiff's right to such funding, for the wrongful purposes as herein alleged.

8  53.    As a legal result of DOE defendants 21-50's wrongful and intentional actions of

9  interfering with Plaintiff's prospective economic advantage relative to the RSTF

10 payments, Plaintiff suffered damages as herein alleged, including loss of RSTF money

11 in excess of $3 million.  To the extent such intentional interference involves private

12 (non-public entity) parties, Plaintiff will seek punitive damages against such

13 individuals, because such conduct was and is despicable, fraudulent and oppressive.

14         WHEREFORE, Plaintiff prays for judgment as follows:

15     1. For injunctive relief under CCP Section 526, restraining The Commission from

16         withholding Plaintiff's RSTF money, and  then ordering and commanding The

17         Commission and relevant DOE defendants to discharge their contractual and

18         statutory duties, and pay Plaintiff its entitled RSTF money.

19     2. For declaratory relief regarding the obligations of The Commission and

20         relevant DOE defendants to pay (and continue to pay) Plaintiff funds under

21         the RSTF, and the proper interpretation of the Compact with respect to those

22         duties, and Plaintiff's entitlement to the RSTF money withheld.

23     3. For compensatory damages owed to Plaintiff from the RSTF, since The

24         Commission withheld those funds from Plaintiff.

25     4. For punitive damages against DOE defendants 21-50 for actions amounting

26         to intentional interference with prospective economic advantage, according to

27         proof at trial.

28     5. For costs of suit and expenses of litigation.

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                    Page 12

6. For prejudgment interest.

7. For any relief consistent with the case made by the Complaint and embraced within the issues, pursuant to CCP § 580(a).

8. For such other relief as the court deems just and proper.

DATED: January 7, 2008

Manuel Corrales, Jr., Esq.
Attorney for Plaintiff
California Valley Miwok Tribe

COMPLAINT FOR INJUNCTIVE RELIEF, ETC.                Page 13

2383

# CALIFORNIA

# TRIBAL-STATE

# GAMING COMPACT

**DIVISION OF GAMBLING CONTROL**
**FEBRUARY - 2002**



EXHIBIT

1

000014

2384

## TRIBAL-STATE GAMING COMPACT
### TABLE OF CONTENTS

| | | |
|---|---|---|
| **PREAMBLE** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| **SECTION 1.0** | PURPOSES AND OBJECTIVES . . . . . . . . . . . | 3 |
| **SECTION 2.0** | DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| **SECTION 3.0** | CLASS III GAMING AUTHORIZED AND PERMITTED . . . . . . . . . . . . . . . . . . . . . | 6 |
| **SECTION 4.0** | SCOPE OF CLASS III GAMING . . . . . . . . . . | 6 |
| **SECTION 5.0** | REVENUE DISTRIBUTION . . . . . . . . . . . . . | 10 |
| **SECTION 6.0** | LICENSING . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| **SECTION 7.0** | COMPLIANCE ENFORCEMENT . . . . . . . . . | 24 |
| **SECTION 8.0** | RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE TRIBAL GAMING OPERATION . . . . . . | 27 |
| **SECTION 9.0** | DISPUTE RESOLUTION PROVISIONS . . . . . | 31 |
| **SECTION 10.0** | PUBLIC AND WORKPLACE HEALTH, SAFETY AND LIABILITY . . . . . . . . . . . . . . | 34 |
| **SECTION 11.0** | EFFECTIVE DATE AND TERM OF COMPACT . . . . . . . . . . . . . . . . . . | 40 |
| **SECTION 12.0** | AMENDMENTS; RENEGOTIATIONS . . . . . . | 40 |
| **SECTION 13.0** | NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| **SECTION 14.0** | CHANGES IN IGRA . . . . . . . . . . . . . . . . . . . . | 42 |
| **SECTION 15.0** | MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . | 42 |
| **INDEX** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44 |

2385

**Generic Tribal-State - Compact  09-10-99**
**TRIBAL-STATE GAMING COMPACT**
**Between the * 1 (a Federally Recognized Indian Tribe)**
**and the STATE OF CALIFORNIA**

This Tribal-State Gaming Compact is entered into on a government-to-government basis by and between the * 1, a federally-recognized sovereign Indian tribe (hereafter "Tribe"), and the State of California, a sovereign State of the United States (hereafter "State"), pursuant to the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, codified at 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) (hereafter "IGRA"), and any successor statute or amendments.

## PREAMBLE

A. In 1988, Congress enacted IGRA as the federal statute governing Indian gaming in the United States. The purposes of IGRA are to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; to provide a statutory basis for regulation of Indian gaming adequate to shield it from organized crime and other corrupting influences; to ensure that the Indian tribe is the primary beneficiary of the gaming operation; to ensure that gaming is conducted fairly and honestly by both the operator and players; and to declare that the establishment of an independent federal regulatory authority for gaming on Indian lands, federal standards for gaming on Indian lands, and a National Indian Gaming Commission are necessary to meet congressional concerns.

B. The system of regulation of Indian gaming fashioned by Congress in IGRA rests on an allocation of regulatory jurisdiction among the three sovereigns involved:  the federal government, the state in which a tribe has land, and the tribe itself. IGRA makes Class III gaming activities lawful on the lands of federally-recognized Indian tribes only if such activities are: (1) authorized by a tribal ordinance, (2) located in a state that permits such gaming for any purpose by any person, organization or entity, and (3) conducted in conformity with a gaming compact entered into between the Indian tribe and the state and approved by the Secretary of the Interior.

C-1.  The Tribe is currently operating a tribal gaming casino offering Class III gaming activities on its land.  On September 1, 1999, the largest number of Gaming Devices operated by the Tribe was *2.

1

000016

2386

**C-2. (ALTERNATE PARAGRAPH)** The Tribe does not currently operate a gaming facility that offers Class III gaming activities. However, on or after the effective date of this Compact, the Tribe intends to develop and operate a gaming facility offering Class III gaming activities on its reservation land, which is located in *3 County of California.

**D.** The State enters into this Compact out of respect for the sovereignty of the Tribe; in recognition of the historical fact that Indian gaming has become the single largest revenue-producing activity for Indian tribes in the United States; out of a desire to terminate pending "bad faith" litigation between the Tribe and the State; to initiate a new era of tribal-state cooperation in areas of mutual concern; out of a respect for the sentiment of the voters of California who, in approving Proposition 5, expressed their belief that the forms of gaming authorized herein should be allowed; and in anticipation of voter approval of SCA 11 as passed by the California legislature.

**E.** The exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California. The parties are mindful that this unique environment is of great economic value to the Tribe and the fact that income from Gaming Devices represents a substantial portion of the tribes' gaming revenues. In consideration for the exclusive rights enjoyed by the tribes, and in further consideration for the State's willingness to enter into this Compact, the tribes have agreed to provide to the State, on a sovereign-to-sovereign basis, a portion of its revenue from Gaming Devices.

**F.** The State has a legitimate interest in promoting the purposes of IGRA for all federally-recognized Indian tribes in California, whether gaming or non-gaming. The State contends that it has an equally legitimate sovereign interest in regulating the growth of Class III gaming activities in California. The Tribe and the State share a joint sovereign interest in ensuring that tribal gaming activities are free from criminal and other undesirable elements.

2

2387

## Section 1.0.  PURPOSES AND OBJECTIVES

The terms of this Gaming Compact are designed and intended to:

   (a) Evidence the goodwill and cooperation of the Tribe and State in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the parties.

   (b) Develop and implement a means of regulating Class III gaming, and only Class III gaming, on the Tribe's Indian lands to ensure it's fair and honest operation in accordance with IGRA, and through that regulated Class III gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs.

   (c) Promote ethical practices in conjunction with that gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Tribe's Gaming Operation and protecting against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming.

## Section 2.0.  DEFINITIONS

   Section 2.1.  "Applicant" means an individual or entity that applies for a Tribal license or State certification.

   Section 2.2.  "Association" means an association of California tribal and state gaming regulators, the membership of which comprises up to two representatives from each tribal gaming agency of those tribes with whom the State has a gaming compact under IGRA, and up to two delegates each from the state Division of Gambling Control and the state Gambling Control Commission.

   Section 2.3.  "Class III gaming" means the forms of Class III gaming defined as such in 25 U.S.C. Sec. 2703(8) and by regulations of the National Indian Gaming Commission.

   Section 2.4.  "Gaming Activities" means the Class III gaming activities authorized under this Gaming Compact.

   Section 2.5. "Gaming Compact" or "Compact" means this compact.

3

**Section 2.6.** "Gaming Device" means a slot machine, including an electronic, electromechanical, electrical, or video device that, for consideration, permits: individual play with or against that device or the participation in any electronic, electromechanical, electrical, or video system to which that device is connected; the playing of games thereon or therewith, including, but not limited to, the playing of facsimiles of games of chance or skill; the possible delivery of, or entitlement by the player to, a prize or something of value as a result of the application of an element of chance; and a method for viewing the outcome, prize won, and other information regarding the playing of games thereon or therewith.

**Section 2.7.** "Gaming Employee" means any person who (a) operates, maintains, repairs, assists in any Class III gaming activity, or is in any way responsible for supervising such gaming activities or persons who conduct, operate, account for, or supervise any such gaming activity, (b) is in a category under federal or tribal gaming law requiring licensing, (c) is an employee of the Tribal Gaming Agency with access to confidential information, or (d) is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public.

**Section 2.8.** "Gaming Facility" or "Facility" means any building in which Class III gaming activities or gaming operations occur, or in which the business records, receipts, or other funds of the gaming operation are maintained (but excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, buildings, and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation, provided that nothing herein prevents the conduct of Class III gaming (as defined under IGRA) therein.

**Section 2.9.** "Gaming Operation" means the business enterprise that offers and operates Class III Gaming Activities, whether exclusively or otherwise.

**Section 2.10.** "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Class III Gaming Activities on the Tribe's Indian lands and approved under IGRA.

**Section 2.11.** "Gaming Resources" means any goods or services provided or used in connection with Class III Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, gambling devices and ancillary equipment, implements of gaming activities such as playing cards and dice, furniture designed primarily for Class III gaming activities, maintenance or security equipment and services, and Class III gaming consulting services  "Gaming Resources" does not include

4

2389

professional accounting and legal services.

Section 2.12. "Gaming Resource Supplier" means any person or entity who, directly or indirectly, manufactures, distributes, supplies, vends, leases, or otherwise purveys Gaming Resources to the Gaming Operation or Gaming Facility, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if the purveyor is not otherwise a Gaming Resource Supplier as described by of Section 6.4.5, the compensation received by the purveyor is not grossly disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gambling Operation.

Section 2.13. "IGRA" means the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, 18 U.S.C. Section 1166 et seq. and 25 U.S.C. Section 2701 et seq.) any amendments thereto, and all regulations promulgated thereunder.

Section 2.14. "Management Contractor" means any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

Section 2.15. "Net Win" means "net win" as defined by American Institute of Certified Public Accountants.

Section 2.16. "NIGC" means the National Indian Gaming Commission.

Section 2.17. "State" means the State of California or an authorized official or agency thereof.

Section 2.18. "State Gaming Agency" means the entities authorized to investigate, approve, and regulate gaming licenses pursuant to the Gambling Control Act (Chapter 5 (commencing with Section 19800) of Division 8 of the Business and Professions Code).

Section 2.19. "Tribal Chairperson" means the person duly elected or selected under the Tribe's organic documents, customs, or traditions to serve as the primary spokesperson for the Tribe.

Section 2.20. "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill

000020

2390

those functions by the National Indian Gaming Commission, as primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribal Gaming Ordinance. No person employed in, or in connection with, the management, supervision, or conduct of any gaming activity may be a member or employee of the Tribal Gaming Agency.

Section 2.21. "Tribe" means a federally-recognized Indian tribe, or an authorized official or agency thereof.

## Section 3.0 CLASS III GAMING AUTHORIZED AND PERMITTED

The Tribe is hereby authorized and permitted to engage in only the Class III Gaming Activities expressly referred to in Section 4.0 and shall not engage in Class III gaming that is not expressly authorized in that Section.

## Section 4.0. SCOPE OF CLASS III GAMING

Section 4.1. Authorized and Permitted Class III gaming. The Tribe is hereby authorized and permitted to operate the following Gaming Activities under the terms and conditions set forth in this Gaming Compact:

(a) The operation of Gaming Devices.

(b) Any banking or percentage card game.

(c) The operation of any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state are permitted to do so under state and federal law.

(d) No (d) in the document.

(e) Nothing herein shall be construed to preclude negotiation of a separate compact governing the conduct of off-track wagering at the Tribe's Gaming Facility.

Section 4.2. Authorized Gaming Facilities. The Tribe may establish and operate not more than two Gaming Facilities, and only on those Indian lands on which gaming may lawfully be conducted under the Indian Gaming Regulatory Act. The Tribe may combine and operate in each Gaming Facility any forms and kinds of gaming permitted under law, except to the extent limited under IGRA, this Compact, or the Tribe's Gaming Ordinance.

6

000021

2391

Section 4.3. Authorized Number of Gaming Devices.

Section 4.3.1. The Tribe may operate no more Gaming Devices than the larger of the following:

(a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or

(b) Three hundred fifty (350) Gaming Devices.

Section 4.3.2. Revenue Sharing with Non-Gaming Tribes.

(a) For the purposes of this Section 4.3.2 and Section 5.0, the following definitions apply:

(i) A "Compact Tribe" is a tribe having a compact with the State that authorizes the Gaming Activities authorized by this Compact. Federally-recognized tribes that are operating fewer than 350 Gaming Devices are "Non-Compact Tribes." Non-Compact Tribes shall be deemed third party beneficiaries of this and other compacts identical in all material respects. A Compact Tribe that becomes a Non-Compact Tribe may not thereafter return to the status of a Compact Tribe for a period of two years becoming a Non-Compact Tribe.

(ii) The Revenue Sharing Trust Fund is a fund created by the Legislature and administered by the California Gambling Control Commission, as Trustee, for the receipt, deposit, and distribution of monies paid pursuant to this Section 4.3.2.

(iii) The Special Distribution Fund is a fund created by the Legislature for the receipt, deposit, and distribution of monies paid pursuant to Section 5.0.

Section 4.3.2.1. Revenue Sharing Trust Fund.

(a) The Tribe agrees with all other Compact Tribes that are parties to compacts having this Section 4.3.2, that each Non-Compact Tribe in the State shall receive the sum of $1.1 million per year. In the event there are insufficient monies in the Revenue Sharing Trust Fund to pay $1.1 million per year to each Non-Compact Tribe, any available monies in that Fund shall be distributed to Non-Compact Tribes in equal shares. Monies in excess of the amount necessary to $1.1 million to each Non-Compact Tribe shall remain in the Revenue Sharing Trust Fund available

7

2392

for disbursement in future years.

(b) Payments made to Non-Compact Tribes shall be made quarterly and in equal shares out of the Revenue Sharing Trust Fund. The Commission shall serve as the trustee of the fund. The Commission shall have no discretion with respect to the use or disbursement of the trust funds. Its sole authority shall be to serve as a depository of the trust funds and to disburse them on a quarterly basis to Non-Compact Tribes. In no event shall the State's General Fund be obligated to make up any shortfall or pay any unpaid claims.

Section 4.3.2.2. Allocation of Licenses.

(a) The Tribe, along with all other Compact Tribes, may acquire licenses to use Gaming Devices in excess of the number they are authorized to use under Section 4.3.1, but in no event may the Tribe operate more than 2,000 Gaming Devices, on the following terms, conditions, and priorities:

(1) The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

(2) The Tribe may acquire and maintain a license to operate a Gaming Device by paying into the Revenue Sharing Trust Fund, on a quarterly basis, in the following amounts:

| Number of Licensed Devices | Fee Per Device Per Annum |
| --- | --- |
| 1-350 | $0 |
| 351-750 | $900 |
| 751-1250 | $1950 |
| 1251-2000 | $4350 |

(3) Licenses to use Gaming Devices shall be awarded as follows:

(i) First, Compact Tribes with no Existing Devices (i.e., the number of Gaming Devices operated by a Compact Tribe as of September 1,

8

2393

1999) may draw up to 150 licenses for a total of 500 Gaming Devices;

(ii) Next, Compact Tribes authorized under Section 4.3.1 to operate up to and including, 500 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (i)), may draw up to an additional 500 licenses, to a total of 1000 Gaming Devices;

(iii) Next, Compact Tribes operating between 501 and 1000 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (ii)), shall be entitled to draw up to an additional 750 Gaming Devices;

(iv) Next, Compact Tribes authorized to operate up to and including 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iii)), shall be entitled to draw up to an additional 500 licenses, for a total authorization to operate up to 2000 gaming devices.

(v) Next, Compact Tribes authorized to operate more than 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iv)), shall be entitled to draw additional licenses up to a total authorization to operate up to 2000 gaming devices.

(vi) After the first round of draws, a second and subsequent round(s) shall be conducted utilizing the same order of priority as set forth above. Rounds shall continue until tribes cease making draws, at which time draws will be discontinued for one month or until the Trustee is notified that a tribe desires to acquire a license, whichever last occurs.

(b), (c) & (d) these subdivisions are not in the document.

(e) As a condition of acquiring licenses to operate Gaming Devices, a non-refundable one-time pre-payment fee shall be required in the amount of $1,250 per Gaming Device being licensed, which fees shall be deposited in the Revenue Sharing Trust Fund. The license for any Gaming Device shall be canceled if the Gaming Device authorized by the license is not in commercial operation within twelve months of issuance of the license.

9

2394

**Section 4.3.2.3.** The Tribe shall not conduct any Gaming Activity authorized by this Compact if the Tribe is more than two quarterly contributions in arrears in its license fee payments to the Revenue Sharing Trust Fund.

**Section 4.3.3.** If requested to do so by either party after March 7, 2003, but not later than March 31, 2003, the parties will promptly commence negotiations in good faith with the Tribe concerning any matters encompassed by Sections 4.3.1 and Section 4.3.2, and their subsections.

## Section 5.0 REVENUE DISTRIBUTION

Section 5.1.

(a) The Tribe shall make contributions to the Special Distribution Fund created by the Legislature, in accordance with the following schedule, but only with respect to the number of Gaming Devices operated by the Tribe on September 1, 1999:

| Number of Terminals in Quarterly Device Base | Percent of Average Gaming Device Net Win |
|---|---|
| 1-200 | 0% |
| 201-500 | 7% |
| 501-1000 | 7% applied to the excess over 200 terminals, up to 500 terminals, plus 10% applied to terminals over 500 terminals, up to 1000 terminals. |
| 1000+ | 7% applied to excess over 200, up to 500 terminals, plus 10% applied to terminals over 500, up to 1000 terminals, plus 13% applied to the excess above 1000 terminals. |

(b) The first transfer to the Special Distribution Fund of its share of the gaming revenue shall made at the conclusion of the first calendar quarter following the second anniversary date of the effective date of this

10

2395

Compact.

Section 5.2. Use of funds. The State's share of the Gaming Device revenue shall be placed in the Special Distribution Fund, available for appropriation by the Legislature for the following purposes:

(a) grants, including any administrative costs, for programs designed to address gambling addiction;

(b) grants, including any administrative costs, for the support of state and local government agencies impacted by tribal government gaming;

(c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the Compact;

(d) payment of shortfalls that may occur in the Revenue Sharing Trust Fund; and

(e) any other purposes specified by the Legislature. It is the intent of the parties that Compact Tribes will be consulted in the process of identifying purposes for grants made to local governments.

Section 5.3.

(a) The quarterly contributions due under Section 5.1 shall be determined and made not later than the thirtieth (30th) day following, the end of each calendar quarter by first determining the total number of all Gaming Devices operated by a Tribe during a given quarter ("Quarterly Device Base"). The "Average Device Net Win" is calculated by dividing the total Net Win from all terminals during the quarter by the Quarterly Terminal Base.

(b) Any quarterly contribution not paid on or before the date on which such amount is due shall be deemed overdue. If any quarterly contribution under Section 5.1 is overdue to the Special Distribution Fund, the Tribe shall pay to the Special Distribution Fund, in addition to the overdue quarterly contribution, interest on such amount from the date the quarterly contribution was due until the date such quarterly contribution (together with interest thereon) was actually paid at the rate of 1.0% per month or the maximum rate permitted by state law, whichever is less. Entitlement to such interest shall be in addition to any other remedies the State may have.

11

2396

(c) At the time each quarterly contribution is made, the Tribe shall submit to the State a report (the "Quarterly Contribution Report") certified by an authorized representative of the Tribe reflecting the Quarterly Device Base, the Net Win from all terminals in the Quarterly Device Base (broken down by Gaming Device), and the Average Device Net Win.

(d) If the State causes an audit to be made pursuant to subdivision (c), and the Average Device Net Win for any quarter as reflected on such quarter's Quarterly Contribution Reports is found to be understated, the State will promptly notify the Tribe, and the Tribe will either accept the difference or provide a reconciliation satisfactory to the State. If the Tribe accepts the difference or does not provide a reconciliation satisfactory to the State, the Tribe must immediately pay the amount of the resulting deficiencies in the quarterly contribution plus interest on such amounts from the date they were due at the rate of 1.0% per month or the maximum rate permitted by applicable law, whichever is less.

(e) The Tribe shall not conduct Class III gaming if more than two quarterly contributions to the Special Distribution Fund are overdue.

### Section 6.0. LICENSING

Section 6.1. Gaming Ordinance and Regulations. All Gaming Activities conducted under this Gaming Compact shall, at a minimum, comply with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, and with all rules, regulations, procedures, specifications, and standards duly adopted by the Tribal Gaming Agency.

Section 6.2. Tribal Ownership, Management, and Control of Gaming Operation. The Gaming Operations authorized under this Gaming Compact shall be owned solely by the Tribe.

Section 6.3. Prohibition Regarding Minors.

(a) Except as provided in subdivision (b), the Tribe shall not permit persons under the age of 18 years to be present in any room in which Class III Gaming Activities are being conducted unless the person is en-route to a non-gaming area of the Gaming Facility.

(b) If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe shall prohibit persons under the age of 21 years from being present in any area in which Class III gaming activities are being conducted and in which alcoholic beverages may be consumed;

12

2397

to the extent required by the state Department of Alcoholic Beverage Control.

Section 6.4.  Licensing Requirements and Procedures.

Section 6.4.1.  Summary of Licensing Principles.  All persons in any way connected with the Gaming Operation or Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under this Gaming Compact, including, but not limited to, all Gaming Employees and Gaming Resource Suppliers, and any other person having a significant influence over the Gaming Operation must be licensed by the Tribal Gaming Agency.  The parties intend that the licensing process provided for in this Gaming Compact shall involve joint cooperation between the Tribal Gaming Agency and the State Gaming Agency, as more particularly described herein.

Section 6.4.2.  Gaming Facility.

(a) The Gaming Facility authorized by this Gaming Compact shall be licensed by the Tribal Gaming Agency in conformity with the requirements of this Gaming Compact, the Tribal Gaming Ordinance and IGRA.  The license shall be reviewed and renewed, if appropriate, every two years thereafter.  Verification that this requirement has been met shall be provided by the Tribe to the State Gaming Agency every two years. The Tribal Gaming Agency's certification to that effect shall be posted in a conspicuous and public place in the Gaming Facility at all times.

(b) In order to protect the health and safety of all Gaming Facility patrons, guests, and employees, all Gaming Facilities of the Tribe constructed after the effective date of this Gaming Compact, and all expansions or modifications to a Gaming Facility in operation as of the effective date of this Compact, shall meet the building and safety codes of the Tribe, which, as a condition for engaging in that construction, expansion, modification, or renovation, shall amend its existing building and safety codes if necessary, or enact such codes if there are none, so that they meet the standards of either the building and safety codes of any county within the boundaries of which the site of the Facility is located, or the Uniform Building Codes, including all uniform fire, plumbing, electrical, mechanical, and related codes then in effect provided that nothing herein shall be deemed to confer jurisdiction upon any county or the State with respect, to any reference to such building and safety codes. Any such construction, expansion or modification will also comply with the federal Americans with Disabilities Act, P.L. 101-336, as amended,

13

2398

42 U.S.C. § 12101 et seq.

(c) Any Gaming Facility in which gaming authorized by this Gaming Compact is conducted shall be issued a certificate of occupancy by the Tribal Gaming Agency prior to occupancy if it was not used for any Gaming Activities under IGRA prior to the effective date of this Gaming Compact, or, if it was so used, within one year thereafter. The issuance of this certificate shall be reviewed for continuing compliance every two years thereafter. Inspections by qualified building and safety experts shall be conducted under the direction of the Tribal Gaming Agency as the basis for issuing any certificate hereunder. The Tribal Gaming Agency shall determine and certify that, as to new construction or new use for gaming, the Facility meets the Tribe's building and safety code, or, as to facilities or portions of facilities that were used for the Tribe's Gaming Activities prior to this Gaming Compact, that the facility or portions thereof do not endanger the health or safety of occupants or the integrity of the Gaming Operation. The Tribe will not offer Class III gaming in a Facility that is constructed or maintained in a manner that endangers the health or safety of occupants or the integrity of the gaming operation.

(d) The State shall designate an agent or agents to be given reasonable notice of each inspection by the Tribal Gaming Agency's experts, which state agents may accompany any such inspection. The Tribe agrees to correct any Gaming Facility condition noted in an inspection that does not meet the standards set forth in subdivisions (b) and (c). The Tribal Gaming Agency and the State's designated agent or agents shall exchange any reports of an inspection within 10 days after completion of the report, which reports shall also be separately and simultaneously forwarded by both agencies to the Tribal Chairperson. Upon certification by the Tribal Gaming Agency's experts that a Gaming Facility meets applicable standards, the Tribal Gaming Agency shall forward the experts' certification to the State within 10 days of issuance. If the State's agent objects to that certification, the Tribe shall make a good faith effort to address the State's concerns, but if the State does not withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of Section 9.0.

Section 6.4.3.  Suitability Standard Regarding Gaming Licenses.

(a) In reviewing an application for a gaming license, and in addition to any standards set forth in the Tribal Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license

14

2399

will undermine public trust that the Tribe's Gaming Operations, or tribal government gaming generally, are free from criminal and dishonest elements and would be conducted honestly. A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the applicant is all of the following, in addition to any other criteria in IGRA or the Tribal Gaming Ordinance:

(a) A person of good character, honesty, and integrity.

(b) A person whose prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gambling, or in the carrying on of the business and financial arrangements incidental thereto.

(c) A person who is in all other respects qualified to be licensed as provided in this Gaming Compact, IGRA, the Tribal Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe. An applicant shall not be found to be unsuitable solely on the ground that the applicant was an employee of a tribal gaming operation in California that was conducted prior to the effective date of this Compact.

Section 6.4.4.  Gaming Employees.

(a) Every Gaming Employee shall obtain, and thereafter maintain current, a valid tribal gaming license, which shall be subject to biennial renewal; provided that in accordance with Section 6.4.9, those persons may be employed on a temporary or conditional basis pending completion of the licensing process.

(b) Except as provided in subdivisions (c) and (d), the Tribe will not employ or continue to employ, any person whose application to the State Gaming Agency for a determination of suitability, or for a renewal of such a determination, has been denied or has expired without renewal.

(c) Notwithstanding subdivision (b), the Tribe may retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if:

(i) the person holds a valid and current license issued by the Tribal

15

000030

2400

Gaming Agency that must be renewed at least biennially;

(ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability;

(iii) the person is not an employee or agent of any other gaming operation; and (iv) the person has been in the continuous employ of the Tribe for at least three years prior to the effective date of this Compact.

(d) Notwithstanding subdivision (b), the Tribe may employ or retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if the person is an enrolled member of the Tribe, as defined in this subdivision, and if

(i) the person holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially;

(ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability; and

(iii) the person is not an employee or agent of any other gaming operation. For purposes of this subdivision, "enrolled member" means a person who is either

(a) certified by the Tribe as having been a member of the Tribe for at least five (5) years, or

(b) a holder of confirmation of membership issued by the Bureau of Indian Affairs.

(e) Nothing herein shall be construed to relieve any person of the obligation to apply for a renewal of a determination of suitability as required by Section 6.5.6.

Section 6.4.5.  Gaming Resource Supplier.  Any Gaming Resource Supplier who, directly or indirectly, provides, has provided, or is deemed likely to provide at least twenty-five thousand dollars ($25,000) in Gaming Resources in any 12-month period, or who has received at least twenty-five thousand

16

000031

2401

dollars ($25,000) in any consecutive 12-month period within the 24-month period immediately preceding application, shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any such Gaming Resources to or in connection with the Tribe's Operation or Facility. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Supplier to update all information provided in the previous application. For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of Gaming Resources with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. Any agreement between the Tribe and a Gaming Resource Supplier shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or non-renewal of the Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.

Section 6.4.6. Financial Sources. Any person extending financing, directly or indirectly, to the Tribe's Gaming Facility or Gaming Operation shall be licensed by the Tribal Gaming Agency prior to extending that financing, provided that any person who is extending financing at the time of the execution of this Compact shall be licensed by the Tribal Gaming Agency within ninety (90) days of such execution. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the previous application. For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. Any agreement between the Tribe and a Financial Source shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination, upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of financing with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. A Gaming Resource Supplier who provides financing exclusively in connection with the sale or lease of Gaming Resources obtained from that

17

000032

2402

Supplier may be licensed solely in accordance with licensing procedures applicable, if at all, to Gaming Resource Suppliers. The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this section, financing provided by a federally regulated or state-regulated bank, savings and loan, or other federally - or state-regulated lending institution; or any agency of the federal, state, or local government; or any investor who, alone or in conjunction with others, holds less than 10% of any outstanding indebtedness evidenced by bonds issued by the Tribe.

Section 6.4.7. Processing Tribal Gaming License Applications. Each applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency. At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including Section 556.4 of Title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees. For applicants who are business entities, these licensing provisions shall apply to the entity as well as:

(i) each of its officers and directors;

(ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager;

(iii) each of its owners or partners, if an unincorporated business;

(iv) each of its shareholders who owns more than 10% of the shares of the corporation, if a corporation; and

(v) each person or entity (other than a financial institution that the Tribal Gaming Agency has determined does not require a license under the preceding section) that, alone or in combination with others, has provided financing in connection with any gaming authorized under this Gaming Compact, if that person or entity provided more than 10% of

(a) the start-up capital,

(b) the operating capital over a 12-month period, or

(c) a combination thereof. For purposes of this Section, where there is any commonality of the characteristics identified in clauses (i) to (v), inclusive, between any two or more entities, those entities may be

18

2403

deemed to be a single entity. Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

Section 6.4.8. Background Investigations of Applicants. The Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the applicant is qualified for a gaming license under the standards set forth in Section 6.4.3, and to fulfill all requirements for licensing under IGRA, the Tribal Gaming Ordinance, and this Gaming Compact. The Tribal Gaming Agency shall not issue other than a temporary license until a determination is made that those qualifications have been met. In lieu of completing its own background investigation, and to the extent that doing so does not conflict with or violate IGRA or the Tribal Gaming Ordinance, the Tribal Gaming Agency may contract with the State Gaming Agency for the conduct of background investigations, may rely on a state certification of non-objection previously issued under a gaming compact involving another tribe, or may rely on a State gaming license previously issued to the applicant, to fulfill some or all of the Tribal Gaming Agency's background investigation obligation. An applicant for a tribal gaming license shall be required to provide releases to the State Gaming Agency to make available to the Tribal Gaming Agency background information regarding the applicant. The State Gaming Agency shall cooperate in furnishing to the Tribal Gaming Agency that information, unless doing so would violate any agreement the State Gaming Agency has with a source of the information other than the applicant, or would impair or impede a criminal investigation, or unless the Tribal Gaming Agency cannot provide sufficient safeguards to assure the State Gaming Agency that the information will remain confidential or that provision of the information would violate state or federal law. If the Tribe adopts an ordinance confirming that Article 6 (commencing with section 11140) of Chapter 1 of Title 1 of Part 4 of the California Penal Code is applicable to members, investigators, and staff of the Tribal Gaming Agency, and those members, investigators, and staff thereafter comply with that ordinance, then, for purposes of carrying out its obligations under this Section, the Tribal Gaming Agency shall be considered to be an entity entitled to receive state summary criminal history information within the meaning of subdivision (b)(12) of section 11105 of the California Penal Code. The California Department of Justice shall provide services to the Tribal Gaming Agency through the California Law Enforcement Telecommunications System (CLETS), subject to a determination by the CLETS advisory committee that the Tribal Gaming Agency is qualified for receipt of such services, and on such terms and conditions as are deemed reasonable by that advisory committee.

19

2404

**Section 6.4.9.** Temporary Licensing of Gaming Employees. Notwithstanding anything herein to the contrary, if the applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the investigation or other information held by that agency does not indicate that the applicant has a criminal history or other information in his or her background that would either automatically disqualify the applicant from obtaining a license or cause a reasonable person to investigate further before issuing a license, or is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary license and may impose such specific conditions thereon pending completion of the applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine. Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary license. A temporary license shall remain in effect until suspended or revoked, or a final determination is made on the application. At any time after issuance of a temporary license, the Tribal Gaming Agency may suspend or revoke it in accordance with Sections 6.5.1 or 6.5.5, and the State Gaming Agency may request suspension or revocation in accordance with subdivision (d) of Section 6.5.6. Nothing herein shall be construed to relieve the Tribe of any obligation under Part 558 of Title 25 of the Code of Federal Regulations.

**Section 6.5.** Gaming License Issuance. Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a license on a conditional or unconditional basis. Nothing herein shall create a property or other right of an applicant in an opportunity to be licensed, or in a license itself, both of which shall be considered to be privileges granted to the applicant in the sole discretion of the Tribal Gaming Agency.

**Section 6.5.1.** Denial, Suspension, or Revocation of Licenses.

(a) Any application for a gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the applicant is determined to be unsuitable or otherwise unqualified for a gaming license. Pending consideration of revocation, the Tribal Gaming Agency may suspend a license in accordance with Section 6.5.5. All rights to notice and hearing shall be governed by tribal law, as to which the applicant will be notified in writing along with notice of an intent to suspend or revoke the license.

(b) (i) Except as provided in paragraph (ii) below, upon receipt of notice that the State Gaming Agency has determined that a person would be unsuitable for licensure in a gambling establishment subject to the

20

000035

2405

jurisdiction of the State Gaming Agency, the Tribal Gaming Agency shall promptly revoke any license that has theretofore been issued to the person; provided that the Tribal Gaming Agency may, in its discretion, re-issue a license to the person following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court conducted pursuant to section 1085 of the California Civil Code.

(ii) Notwithstanding a determination of unsuitability by the State Gaming Agency, the Tribal Gaming Agency may, in its discretion, decline to revoke a tribal license issued to a person employed by the Tribe pursuant to Section 6.4.4(c) or Section 6.4.4(d).

Section 6.5.2. Renewal of Licenses; Extensions; Further Investigation. The term of a tribal gaming license shall not exceed two years, and application for renewal of a license must be made prior to its expiration. Applicants for renewal of a license shall provide updated material as requested, on the appropriate renewal forms, but, at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or that is otherwise available to the Tribal Gaming Agency. At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the applicant's continuing suitability or eligibility for a license. Prior to renewing a license, the Tribal Gaming Agency shall deliver to the State Gaming Agency copies of all information and documents received in connection with the application for renewal.

Section 6.5.3. Identification Cards. The Tribal Gaming Agency shall require that all persons who are required to be licensed wear, in plain view at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency. Identification badges must display information including, but not limited to, a photograph and an identification number that is adequate to enable agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

Section 6.5.4. Fees for Tribal License. The fees for all tribal licenses shall be set by the Tribal Gaming Agency.

Section 6.5.5. Suspension of Tribal License. The Tribal Gaming Agency may summarily suspend the license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person or entity could constitute a threat to the public health or safety or may violate the Tribal Gaming Agency's licensing or other standards. Any right to notice or hearing in regard thereto shall be governed by Tribal law.

21

2406

### Section 6.5.6. State Certification Process.

(a) Upon receipt of a completed license application and a determination by the Tribal Gaming Agency that it intends to issue the earlier of a temporary or permanent license, the Tribal Gaming Agency shall transmit to the State Gaming Agency a notice of intent to license the applicant, together with all of the following:

(i) a copy of all tribal license application materials and information received by the Tribal Gaming Agency from the applicant;

(ii) an original set of fingerprint cards;

(iii) a current photograph; and

(iv) except to the extent waived by the State Gaming Agency, such releases of information, waivers, and other completed and executed forms as have been obtained by the Tribal Gaming Agency. Except for an applicant for licensing as a non-key Gaming Employee, as defined by agreement between the Tribal Gaming Agency and the State Gaming Agency, the Tribal Gaming Agency shall require the applicant also to file an application with the State Gaming Agency, prior to issuance of a temporary or permanent tribal gaming license, for a determination of suitability for licensure under the California Gambling Control Act. Investigation and disposition of that application shall be governed entirely by state law, and the State Gaming Agency shall determine whether the applicant would be found suitable for licensure in a gambling establishment subject to that Agency's jurisdiction. Additional information may be required by the State Gaming Agency to assist in its background investigation, provided that such State Gaming Agency requirement shall be no greater than that which may be required of applicants for a State gaming license in connection with nontribal gaming activities and at a similar level of participation or employment. A determination of suitability is valid for the term of the tribal license held by the applicant, and the Tribal Gaming Agency shall require a licensee to apply for renewal of a determination of suitability at such time as the licensee applies for renewal of a tribal gaming license. The State Gaming Agency and the Tribal Gaming Agency (together with tribal gaming agencies under other gaming compacts) shall cooperate in developing standard licensing forms for tribal gaming license applicants, on a statewide basis, that reduce or eliminate

22

2407

duplicative or excessive paperwork, which forms and procedures shall take into account the Tribe's requirements under IGRA and the expense thereof.

(b) Background Investigations of Applicants.  Upon receipt of completed license application information from the Tribal Gaming Agency, the State Gaming Agency may conduct a background investigation pursuant to state law to determine whether the applicant would be suitable to be licensed for association with a gambling establishment subject to the jurisdiction of the State Gaming Agency.  If further investigation is required to supplement the investigation conducted by the Tribal Gaming Agency, the applicant will be required to pay the statutory application fee charged by the State Gaming Agency pursuant to California Business and Professions Code section 19941(a), but any deposit requested by the State Gaming Agency pursuant to section 19855 of that Code shall take into account reports of the background investigation already conducted by the Tribal Gaming Agency and the NIGC, if any.  Failure to pay the application fee or deposit maybe grounds for denial of the application by the State Gaming Agency.  The State Gaming Agency and Tribal Gaming Agency shall cooperate in sharing as much background information as possible, both to maximize investigative efficiency and thoroughness, and to minimize investigative costs.  Upon completion of the necessary background investigation or other verification of suitability, the State Gaming Agency shall issue a notice to the Tribal Gaming Agency certifying that the State has determined that the applicant would be suitable, or that the applicant would be unsuitable, for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency and, if unsuitable, stating the reasons therefor.

(c) The Tribe shall monthly provide the State Gaming Agency with the name, badge identification number, and job descriptions of all, non-key Gaming Employees.

(d) Prior to denying an application for a determination of suitability, the State Gaming Agency shall notify the Tribal Gaming Agency and afford the Tribe an opportunity to be heard.  If the State Gaming Agency denies an application for a determination of suitability, that Agency shall provide the applicant with written notice of all appeal rights available under state law.

23

000038

2408

## Section 7.0. COMPLIANCE ENFORCEMENT

Section 7.1.  On-Site Regulation.  It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Gaming Compact, IGRA, and the Tribal Gaming Ordinance with respect to Gaming Operation and Facility compliance, and to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and the confidence of patrons that tribal government gaming in California meets the highest standards of regulation and internal controls.  To meet those responsibilities, the Tribal Gaming Agency shall adopt and enforce regulations, procedures, and practices as set forth herein.

Section 7.2.  Investigation and Sanctions.  The Tribal Gaming Agency shall investigate any reported violation of this Gaming Compact and shall require the Gaming Operation to correct the violation upon such terms and conditions as the Tribal Gaming Agency determines are necessary.  The Tribal Gaming Agency shall be empowered by the Tribal Gaming Ordinance to impose fines or other sanctions within the jurisdiction of the Tribe against gaming licensees or other persons who interfere with or violate the Tribe's gaming regulatory requirements and obligations under IGRA, the Tribal Gaming Ordinance, or this Gaming Compact.  The Tribal Gaming Agency shall report significant or continued violations of this Compact or failures to comply with its orders to the State Gaming Agency.

Section 7.3.  Assistance by State Gaming Agency.  The Tribe may request the assistance of the State Gaming Agency whenever it reasonably appears that such assistance may be necessary to carry out the purposes described in Section 7.1, or otherwise to protect public health, safety, or welfare.  If requested by the Tribe or Tribal Gaming Agency, the State Gaming Agency shall provide requested services to ensure proper compliance with this Gaming Compact.  The State shall be reimbursed for its actual and reasonable costs of that assistance, if the assistance required expenditure of extraordinary costs.

Section 7.4.  Access to Premises by State Gaming Agency; Notification; Inspections.  Notwithstanding that the Tribe has the primary responsibility to administer and enforce the regulatory requirements of this Compact, the State Gaming Agency shall have the right to inspect the Tribe's Gaming Facility with respect to Class III Gaming Activities only, and all Gaming Operation or Facility records relating thereto, subject to the following conditions:

24

000039

2409

**Section 7.4.1.** Inspection of public areas of a Gaming Facility may be made at any time without prior notice during normal Gaming Facility business hours.

**Section 7.4.2.** Inspection of areas of a Gaming Facility not normally accessible to the public may be made at any time during normal Gaming Facility business hours, immediately after the State Gaming Agency's authorized inspector notifies the Tribal Gaming Agency of his or her presence on the premises, presents proper identification, and requests access to the non-public areas of the Gaming Facility. The Tribal Gaming Agency, in its sole discretion, may require a member of the Tribal Gaming Agency to accompany the State Gaming Agency inspector at all times that the State Gaming Agency inspector is in a non-public area of the Gaming Facility. If the Tribal Gaming Agency imposes such a requirement, it shall require such member to be available at all times for those purposes and shall ensure that the member has the ability to gain immediate access to all non-public areas of the Gaming Facility. Nothing in this Compact shall be construed to limit the State Gaming Agency to one inspector during inspections.

**Section 7.4.3.**

(a) Inspection and copying of Gaming Operation papers, books, and records may occur at any time, immediately after notice to the Tribal Gaming Agency, during the normal hours of the Gaming Facility's business office, provided that the inspection and copying of those papers, books or records shall not interfere with the normal functioning of the Gaming Operation or Facility. Notwithstanding any other provision of California law, all information and records that the State Gaming Agency obtains, inspects, or copies pursuant to this Gaming Compact shall be, and remain, the property solely of the Tribe; provided that such records and copies may be retained by the State Gaming Agency as reasonably necessary for completion of any investigation of the Tribe's compliance with this Compact.

(b) (i) The State Gaming Agency will exercise utmost care in the preservation of the confidentiality of any and all information and documents received from the Tribe, and will apply the highest standards of confidentiality expected under state law to preserve such information and documents from disclosure. The Tribe may avail itself of any and all remedies under state law for improper disclosure of information or documents. To the extent reasonably feasible, the State Gaming Agency will consult with representatives of the Tribe prior to disclosure of any documents received from the Tribe, or any documents compiled from

25

000040

2410

such documents or from information received from the Tribe, including any disclosure compelled by judicial process, and, in the case of any disclosure compelled by judicial process, will endeavor to give the Tribe immediate notice of the order compelling disclosure and a reasonable opportunity to interpose an objection thereto with the court.

(ii) The Tribal Gaming Agency and the State Gaming Agency shall confer and agree upon protocols for release to other law enforcement agencies of information obtained during the course of background investigations.

(c) Records received by the State Gaming Agency from the Tribe in compliance with this Compact, or information compiled by the State Gaming Agency from those records, shall be exempt from disclosure under the California Public Records Act.

Section 7.4.4.  Notwithstanding any other provision of this Compact, the State Gaming Agency shall not be denied access to papers, books, records, equipment, or places where such access is reasonably necessary to ensure compliance with this Compact.

Section 7.4.5.

(a) Subject to the provisions of subdivision (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's land except in accordance with procedures established by agreement between the State Gaming Agency and the Tribal Gaming Agency and upon at least 10 days' notice to the Sheriff's Department for the county in which the land is located.

(b) Transportation of a Gaming Device from the Gaming Facility within California is permissible only if:

(i) The final destination of the device is a gaming facility of any tribe in California that has a compact with the State;

(ii) The final destination of the device is any other state in which possession of the device or devices is made lawful by state law or by tribal-state compact;

(iii) The final destination of the device is another country, or any state or province of another country, wherein possession of the device is lawful; or

26

241

(iv) The final destination is a location within California for testing, repair, maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency and has been found suitable for licensure by the State Gaming Agency.

(c) Gaming Devices transported off the Tribe's land in violation of this Section 7.4.5 or in violation of any permit issued pursuant thereto is subject to summary seizure by California peace officers.

## Section 8.0. RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE TRIBAL GAMING OPERATION

Section 8.1. Adoption of Regulations for Operation and Management; Minimum Standards. In order to meet the goals set forth in this Gaming Compact and required of the Tribe by law, the Tribal Gaming Agency shall be vested with the authority to promulgate, and shall promulgate, at a minimum, rules and regulations or specifications governing the following subjects, and to ensure their enforcement in an effective manner:

Section 8.1.1. The enforcement of all relevant laws and rules with respect to the Gaming Operation and Facility, and the power to conduct investigations and hearings with respect thereto, and to any other subject within its jurisdiction.

Section 8.1.2. Ensuring the physical safety of Gaming Operation patrons and employees, and any other person while in the Gaming Facility. Nothing herein shall be construed to make applicable to the Tribe any state laws, regulations, or standards governing the use of tobacco.

Section 8.1.3. The physical safeguarding of assets transported to, within, and from the Gaming Facility.

Section 8.1.4. The prevention of illegal activity from occurring within the Gaming Facility or with regard to the Gaming Operation, including, but not limited to, the maintenance of employee procedures and a surveillance system as provided below.

Section 8.1.5. The recording of any and all occurrences within the Gaming Facility that deviate from normal operating policies and procedures (hereafter "incidents"). The procedure for recording incidents shall:

(1) specify that security personnel record all incidents, regardless of an employee's determination that the incident may be immaterial (all

27

2412

incidents shall be identified in writing);

(2) require the assignment of a sequential number to each report;

(3) provide for permanent reporting in indelible ink in a bound notebook from which pages cannot be removed and by which entries are made on each side of each page; and

(4) require that each report include, at a minimum, all of the following:

    (a) The record number.

    (b) The date.

    (c) The time.

    (d) The location of the incident.

    (e) A detailed description of the incident.

    (f) The persons involved in the incident.

    (g) The security department employee assigned to the incident.

Section 8.1.6.  The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like, consistent with industry practice.

Section 8.1.7.  Maintenance of a list of persons barred from the Gaming Facility who, because of their past behavior, criminal history, or association with persons or organizations, pose a threat to the integrity of the Gaming Activities of the Tribe or to the integrity of regulated gaming within the State.

Section 8.1.8.  The conduct of an audit of the Gaming Operation, not less than annually, by an independent certified public accountant, in accordance with the auditing and accounting standards for audits of casinos of the American Institute of Certified Public Accountants.

Section 8.1.9.  Submission to, and prior approval from, the Tribal Gaming Agency of the rules and regulations of each Class III game to be operated by the Tribe, and of any changes in those rules and regulations. No Class III game may be played that has not received Tribal Gaming Agency approval.

28

2413

Section 8.1.10. Addressing all of the following:

(a) Maintenance of a copy of the rules, regulations, and procedures for each game as played, including, but not limited to, the method of play and the odds and method of determining amounts paid to winners;

(b) Specifications and standards to ensure that information regarding the method of play, odds, and payoff determinations shall be visibly displayed or available to patrons in written form in the Gaming Facility;

(c) Specifications ensuring that betting limits applicable to any gaming station shall be displayed at that gaming station;

(d) Procedures ensuring that in the event of a patron dispute over the application of any gaming rule or regulation, the matter shall be handled in accordance with, industry practice and principles of fairness, pursuant to the Tribal Gaming Ordinance and any rules and regulations promulgated by the Tribal Gaming Agency.

Section 8.1.11. Maintenance of a closed-circuit television surveillance system consistent with industry standards for gaming facilities of the type and scale operated by the Tribe, which system shall be approved by, and may not be modified without the approval of the Tribal Gaming Agency. The Tribal Gaming Agency shall have current copies of the Gaming Facility floor plan and closed-circuit television system at all times, and any modifications thereof first shall be approved by the Tribal Gaming Agency.

Section 8.1.12. Maintenance of a cashier's cage in accordance with industry standards for such facilities.

Section 8.1.13. Specification of minimum staff and supervisory requirements for each Gaming Activity to be conducted.

Section 8.1.14. Technical standards and specifications for the operation of Gaming Devices and other games authorized herein to be conducted by the Tribe, which technical specifications may be no less stringent than those approved by a recognized gaming testing laboratory in the gaming industry.

Section 8.2. State Civil and Criminal Jurisdiction. Nothing in this Gaming Compact affects the civil or criminal jurisdiction of the State under Public Law 280 (18 U.S.C. Section 1162; 28 U.S.C. Section 1360) or IGRA, to the extent applicable. In addition, criminal jurisdiction to enforce state gambling laws is transferred to the State pursuant to 18 U.S.C. § 1166(d), provided that

29

no Gaming Activity conducted by the Tribe pursuant to this Gaming Compact may be deemed to be a civil or criminal violation of any law of the State.

**Section 8.3.**

(a) The Tribe shall take all reasonable steps to ensure that members of the Tribal Gaming Agency are free from corruption, undue influence, compromise, and conflicting interests in the conduct of their duties under this Compact; shall adopt a conflict-of-interest code to that end; and shall ensure the prompt removal of any member of the Tribal Gaming Agency who is found to have acted in a corrupt or compromised manner.

(b) The Tribe shall conduct a background investigation on a prospective member of the Tribal Gaming Agency, who shall meet the background requirements of a management contractor under IGRA; provided that, if such official is elected through a tribal election process, that official may not participate in any Tribal Gaming Agency matters under this Compact unless a background investigation has been concluded and the official has been found to be suitable. If requested by the tribal government or the Tribal Gaming Agency, the State Gaming Agency may assist in the conduct of such a background investigation and may assist in the investigation of any possible corruption or compromise of a member of the agency.

Section 8.4. In order to foster statewide uniformity of regulation of Class III gaming operations throughout the state, rules, regulations, standards, specifications, and procedures of the Tribal Gaming Agency in respect to any matter encompassed by Sections 6.0, 7.0, or 8.0 shall be consistent with regulations adopted by the State Gaming Agency in accordance with Section 8.4.1. Chapter 3.5 (commencing with section 11340) of Part 1 of Division 3 of Title 2 of the California Government Code does not apply to regulations adopted by the State Gaming Agency in respect to tribal gaming operations under this Section.

**Section 8.4.1.**

(a) Except as provided in subdivision (d), no State Gaming Agency regulation shall be effective with respect to the Tribe's Gaming Operation unless it has first been approved by the Association and the Tribe has had an opportunity to review and comment on the proposed regulation.

30

000045

2415

(b) Every State Gaming Agency regulation that is intended to apply to the Tribe (other than a regulation proposed or previously approved by the Association) shall be submitted to the Association for consideration prior to submission of the regulation to the Tribe for comment as provided in subdivision (c). A regulation that is disapproved by the Association shall not be submitted to the Tribe for comment unless it is re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections.

(c) Except as provided in subdivision (d), no regulation of the State Gaming Agency shall be adopted as a final regulation in respect to the Tribe's Gaming Operation before the expiration of 30 days after submission of the proposed regulation to the Tribe for comment as a proposed regulation, and after consideration of the Tribe's comments, if any.

(d) In exigent circumstances (e.g., imminent threat to public health and safety), the State Gaming Agency may adopt a regulation that becomes effective immediately. Any such regulation shall be accompanied by a detailed, written description of the exigent circumstances, and shall be submitted immediately to the Association for consideration. If the regulation is disapproved by the Association, it shall cease to be effective, but may be re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections, and thereafter submitted to the Tribe for comment as provided in subdivision (c).

(e) The Tribe may object to a State Gaming Agency regulation on the ground that it is unnecessary, unduly burdensome, or unfairly discriminatory, and may seek repeal or amendment of the regulation through the dispute resolution process of Section 9.0.

### Section 9.0. DISPUTE RESOLUTION PROVISIONS

Section 9.1. Voluntary Resolution; Reference to Other Means of Resolution. In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that occur under this Gaming Compact by good faith negotiations whenever possible. Therefore, without prejudice to the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the parties hereby establish a threshold requirement that disputes between the Tribe and the State first be subjected to a process of meeting and conferring in good faith in order to foster a spirit of cooperation

31

2416

and efficiency in the administration and monitoring of performance and compliance by each other with the terms, provisions, and conditions of this Gaming Compact, as follows:

(a) Either party shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth, with specificity, the issues to be resolved.

(b) The parties shall meet and confer in a good faith attempt to resolve the dispute through negotiation not later than 10 days after receipt of the notice, unless both parties agree in writing to an extension of time.

(c) If the dispute is not resolved to the satisfaction of the parties within 30 calendar days after the first meeting, then either party may seek to have the dispute resolved by an arbitrator in accordance with this section, but neither party shall be required to agree to submit to arbitration.

(d) Disagreements that are not otherwise resolved by arbitration or other mutually acceptable means as provided in Section 9.3 may be resolved in the United States District Court where the Tribe's Gaming Facility is located, or is to be located, and the Ninth Circuit Court of Appeals (or, if those federal courts lack jurisdiction, in any state court of competent jurisdiction and its related courts of appeal). The disputes to be submitted to court action include, but are not limited to, claims of breach or violation of this Compact, or failure to negotiate in good faith as required by the terms of this Compact. In no event may the Tribe be precluded from pursuing any arbitration or judicial remedy against the State on the grounds that the Tribe has failed to exhaust its state administrative remedies. The parties agree that, except in the case of imminent threat to the public health or safety, reasonable efforts will be made to explore alternative dispute resolution avenues prior to resort to judicial process.

Section 9.2. Arbitration Rules. Arbitration shall be conducted in accordance with the policies and procedures of the Commercial Arbitration Rules of the American Arbitration Association, and shall be held on the Tribe's land or, if unreasonably inconvenient under the circumstances, at such other location as the parties may agree. Each side shall bear its own costs, attorneys' fees, and one-half the costs and expenses of the American Arbitration Association and the arbitrator, unless the arbitrator rules otherwise. Only one neutral arbitrator may be named, unless the Tribe or the State objects, in which case a panel of three arbitrators (one of whom is selected by each party) will be named. The provisions of Section 1283.05 of the California Code of Civil Procedure shall apply; provided that no discovery

32

2417

authorized by that section may be conducted without leave of the arbitrator. The decision of the arbitrator shall be in writing, give reasons for the decision, and shall be binding. Judgment on the award may be entered in any federal or state court having jurisdiction thereof.

Section 9.3. No Waiver or Preclusion of Other Means of Dispute Resolution. This Section 9.0 may not be construed to waive, limit, or restrict any remedy that is otherwise available to either party, nor may this Section be construed to preclude, limit, or restrict the ability of the parties to pursue, by mutual agreement, any other method of dispute resolution, including, but not limited to, mediation or utilization of a technical advisor to the Tribal and State Gaming Agencies; provided that neither party is under any obligation to agree to such alternative method of dispute resolution.

Section 9.4. Limited Waiver of Sovereign Immunity.

(a) In the event that a dispute is to be resolved in federal court or a state court of competent jurisdiction as provided in this Section 9.0, the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that:

(1) The dispute is limited solely to issues arising under this Gaming Compact;

(2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought); and

(3) No person or entity other than the Tribe and the State is party to the action, unless failure to join a third party would deprive the court of jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State in respect to any such third party.

(b) In the event of intervention by any additional party into any such action without the consent of the Tribe and the State, the waivers of either the Tribe or the State provided for herein may be revoked, unless joinder is required to preserve the court's jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State in respect to any such third party.

33

2418

(c) The waivers and consents provided for under this Section 9.0 shall extend to civil actions authorized by this Compact, including, but not limited to, actions to compel arbitration, any arbitration proceeding herein, any action to confirm or enforce any judgment or arbitration award as provided herein, and any appellate proceedings emanating from a matter in which an immunity waiver has been granted. Except as stated herein or elsewhere in this Compact, no other waivers or consents to be sued, either express or implied, are granted by either party.

## Section 10.0. PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY

Section 10.1.  The Tribe will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare; provided that nothing herein shall be construed to make applicable to the Tribe any state laws or regulations governing the use of tobacco.

Section 10.2.  Compliance.  For the purposes of this Gaming Compact, the Tribal Gaming, Operation shall:

(a) Adopt and comply with standards no less stringent than state public health standards for food and beverage handling.  The Gaming Operation will allow inspection of food and beverage services by state or county health inspectors, during normal hours of operation, to assess compliance with these standards, unless inspections are routinely made by an agency of the United States government to ensure compliance with equivalent standards of the United States Public Health Service.  Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(b) Adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California; the Gaming Operation will allow for inspection and testing of water quality by state or county health inspectors, as applicable, during normal hours of operation, to assess compliance with these standards, unless inspections and testing are made by an agency of the United States pursuant to, or by the Tribe under express authorization of, federal law, to ensure compliance with federal water quality and safe drinking water standards. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

34

000049

(c) Comply with the building and safety standards set forth in Section 6.4.

(d) Carry no less than five million dollars ($5,000,000) in public liability insurance for patron claims, and that the Tribe provide reasonable assurance that those claims will be promptly and fairly adjudicated, and that legitimate claims will be paid; provided that nothing herein requires the Tribe to agree to liability for punitive damages or attorneys' fees. On or before the effective date of this Compact or not less than 30 days prior to the commencement of Gaming Activities under this Compact, whichever is later, the Tribe shall adopt and make available to patrons a tort liability ordinance setting forth the terms and conditions, if any, under which the Tribe waives immunity to suit for money damages resulting from intentional or negligent injuries to person or property at the Gaming Facility or in connection with the Tribe's Gaming Operation, including procedures for processing any claims for such money damages; provided that nothing in this Section shall require the Tribe to waive its immunity to suit except to the extent of the policy limits set out above.

(e) Adopt and comply with standards no less stringent than federal workplace and occupational health and safety standards; the Gaming Operation will allow for inspection of Gaming Facility workplaces by state inspectors, during normal hours of operation, to assess compliance with these standards, unless inspections are regularly made by an agency of the United States government to ensure compliance with federal workplace and occupational health and safety standards. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(f) Comply with tribal codes and other applicable federal law regarding public health and safety.

(g) Adopt and comply with standards no less stringent than federal laws and state laws forbidding employers generally from discriminating in the employment of persons to work for the Gaming Operation or in the Gaming Facility on the basis of race, color, religion, national origin, gender, sexual orientation, age, or disability; provided that nothing herein shall preclude the tribe from giving a preference in employment to Indians, pursuant to a duly adopted tribal ordinance.

(h) Adopt and comply with standards that are no less stringent than state laws prohibiting a gaming enterprise from cashing any check drawn against a federal, state, county, or city fund, including but not limited to,

35

Social Security, unemployment insurance, disability payments, or public assistance payments.

(I) Adopt and comply with standards that are no less stringent than state laws, if any, prohibiting a gaming enterprise from providing, allowing, contracting to provide, or arranging to provide alcoholic beverages, or food or lodging for no charge or at reduced prices at a gambling establishment or lodging facility as an incentive or enticement.

(J) Adopt and comply with standards that are no less stringent than state laws, if any, prohibiting extensions of credit.

(k) Provisions of the Bank Secrecy Act, P.L. 91-508, October 26, 1970, 31 U.S.C. Section 5311-5314, as amended, and all reporting requirements of the Internal Revenue Service, insofar as such provisions and reporting requirements are applicable to casinos.

Section 10.2.1. The Tribe shall adopt and, not later than 30 days after the effective date of this Compact, shall make available on request the standards described in subdivisions (a)-(c) and (e)-(k) of Section 10.2 to which the Gaming Operation is held. In the absence of a promulgated tribal standard in respect to a matter identified in those subdivisions, or the express adoption of an applicable federal statute or regulation in lieu of a tribal standard in respect to any such matter, the applicable state statute or regulation shall be deemed to have been adopted by the Tribe as the applicable standard.

Section 10.3. Participation in state statutory programs related to employment.

(a) In lieu of permitting the Gaming Operation to participate in the state statutory workers' compensation system, the Tribe may create and maintain a system that provides redress for employee work-related injuries through requiring insurance or self-insurance, which system must include a scope of coverage, availability of an independent medical examination, right to notice, hearings before an independent tribunal, a means of enforcement against the employer, and benefits comparable to those mandated for comparable employees under state law. Not later than the effective date of this Compact, or 60 days prior to the commencement of Gaming Activities under this Compact, the Tribe will advise the State of its election to participate in the statutory workers' compensation system or, alternatively, will forward to the State all relevant ordinances that have been adopted and all other documents establishing the system and demonstrating that the system is fully operational and compliant with the

36

2421

comparability standard set forth above. The parties agree that independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

(b) The Tribe agrees that its Gaming Operation will participate in the State's program for providing unemployment compensation benefits and unemployment compensation disability benefits with respect to employees employed at the Gaming Facility, including compliance with the provisions of the California Unemployment Insurance Code, and the Tribe consents to the jurisdiction of the state agencies charged with the enforcement of that Code and of the courts of the State of California for purposes of enforcement.

(c) As a matter of comity, with respect to persons employed at the Gaming Facility, other than members of the Tribe, the Tribal Gaming Operation shall withhold all taxes due to the State as provided in the California Unemployment Insurance Code and the Revenue and Taxation Code, and shall forward such amounts as provided in said Codes to the State.

**Section 10.4.** Emergency Service Accessibility. The Tribe shall make reasonable provisions for adequate emergency fire, medical, and related relief and disaster services for patrons and employees of the Gaming Facility.

**Section 10.5.** Alcoholic Beverage Service. Standards for alcohol service shall be subject to applicable law.

**Section 10.6.** Possession of firearms shall be prohibited at all times in the Gaming Facility except for state, local, or tribal security or law enforcement personnel authorized by tribal law and by federal or state law to possess fire arms at the Facility.

**Section 10.7.** Labor Relations. Notwithstanding any other provision of this Compact, this Compact shall be null and void if, on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.

37

000052

2422

**Section 10.8.** Off-Reservation Environmental Impacts.

**Section 10.8.1.** On or before the effective date of this Compact, or not less than 90 days prior to the commencement of a Project, as defined herein, the Tribe shall adopt an ordinance providing for the preparation, circulation, and consideration by the Tribe of environmental impact reports concerning potential off-Reservation environmental impacts of any and all Projects to be commenced on or after the effective date of this Compact. In fashioning the environmental protection ordinance, the Tribe will make a good faith effort to incorporate the policies and purposes of the National Environmental Policy Act and the California Environmental Quality Act consistent with the Tribe's governmental interests.

**Section 10.8.2.**

(a) Prior to commencement of a Project, the Tribe will:

(1) Inform the public of the planned Project;

(2) Take appropriate actions to determine whether the project will have any significant adverse impacts on the off-Reservation environment;

(3) For the purpose of receiving and responding to comments, submit all environmental impact reports concerning the proposed Project to the State Clearinghouse in the Office of Planning and Research and the county board of supervisors, for distribution to the public.

(4) Consult with the board of supervisors of the county or counties within which the Tribe's Gaming Facility is located, or is to be located, and, if the Gaming Facility is within a city, with the city council, and if requested by the board or council, as the case may be, meet with them to discuss mitigation of significant adverse off-Reservation environmental impacts;

(5) Meet with and provide an opportunity for comment by those members of the public residing off-Reservation within the vicinity of the Gaming Facility such as might be adversely affected by proposed Project.

(b) During the conduct of a Project, the Tribe shall:

(1) Keep the board or council, as the case may be, and potentially affected members of the public apprized of the project's progress; and

38

2423

(2) Make good faith efforts to mitigate any and all such significant adverse off-Reservation environmental impacts.

(c) As used in Section 10.8.1 and this Section 10.8.2, the term "Project" means any expansion or any significant renovation or modification of an existing Gaming Facility, or any significant excavation, construction, or development associated with the Tribe's Gaming Facility or proposed Gaming Facility and the term "environmental impact reports" means any environmental assessment, environmental impact report, or environmental impact statement, as the case may be.

Section 10.8.3.

(a) The Tribe and the State shall, from time to time, meet to review the adequacy of this Section 10.8, the Tribe's ordinance adopted pursuant thereto, and the Tribe's compliance with its obligations under Section 10.8.2, to ensure that significant adverse impacts to the off-Reservation environment resulting from projects undertaken by the Tribe may be avoided or mitigated.

(b) At any time after January 1, 2003, but not later than March 1, 2003, the State may request negotiations for an amendment to this Section 10.8 on the ground that, as it presently reads, the Section has proven to be inadequate to protect the off-Reservation environment from significant adverse impacts resulting from Projects undertaken by the Tribe or to ensure adequate mitigation by the Tribe of significant adverse off-Reservation environmental impacts and, upon such a request, the Tribe will enter into such negotiations in good faith.

(c) On or after January 1, 2004, the Tribe may bring an action in federal court under 25 U.S.C. Section 2710(d)(7)(A)(i) on the ground that the State has failed to negotiate in good faith, provided that the Tribe's good faith in the negotiations shall also be in issue. In any such action, the court may consider whether the State's invocation of its rights under subdivision (b) of this Section 10.8.3 was in good faith. If the State has requested negotiations pursuant to subdivision (b) but, as of January 1, 2005, there is neither an agreement nor an order against the State under 25 U.S.C. Section 2710(d)(7)(B)(iii), then, on that date, the Tribe shall immediately cease construction and other activities on all projects then in progress that have the potential to cause adverse off-Reservation impacts, unless and until an agreement to amend this Section 10.8 has been concluded between the Tribe and the State.

39

2424

## Section 11.0. EFFECTIVE DATE AND TERM OF CONTACT

Section 11.1.  Effective Date.  This Gaming Compact shall not be effective unless and until all of the following have occurred:

(a) The Compact is ratified by statute in accordance with state law;

(b) Notice of approval or constructive approval is published in the Federal Register as provided in 25 U.S.C. 2710(d)(3)(B); and

(c) SCA 11 is approved by the California voters in the March 2000 general election.

Section 11.2.  Term of Compact; Termination.

Section 11.2.1.  Effective.

(a) Once effective this Compact shall be in full force and effect for state law purposes until December 31, 2020.

(b) Once ratified, this Compact shall constitute a binding and determinative agreement between the Tribe and the State, without regard to voter approval of any constitutional amendment, other than SCA 11, that authorizes a gaming compact.

(c) Either party may bring an action in federal court, after providing a sixty (60) day written notice of an opportunity to cure any alleged breach of this Compact, for a declaration that the other party has materially breached this Compact.  Upon issuance of such a declaration, the complaining party may unilaterally terminate this Compact upon service of written notice on the other party.  In the event a federal court determines that it lacks jurisdiction over such an action, the action may be brought in the superior court for the county in which the Tribe's Gaming Facility is located.  The parties expressly waive their immunity to suit for purposes of an action under this subdivision, subject to the qualifications stated in Section 9.4(a).

## Section 12.0.  AMENDMENTS: RENEGOTIATIONS

Section 12.1.  The terms and conditions of this Gaming Compact may be amended at any time by the mutual and written agreement of both parties.

40

2425

Section 12.2. This Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose, provided that no such renegotiation may be sought for 12 months following the effective date of this Gaming Compact.

Section 12.3. Process and Negotiation Standards. All requests to amend or renegotiate this Gaming Compact shall be in writing, addressed to the Tribal Chairperson or the Governor, as the case may be, and shall include the activities or circumstances to be negotiated, together with a statement of the basis supporting the request. If the request meets the requirements of this Section, the parties shall confer promptly and determine a schedule for commencing negotiations within 30 days of the request. Unless expressly provided otherwise herein, all matters involving negotiations or other amendatory processes under Section 4.3.3(b) and this Section 12.0 shall be governed, controlled, and conducted in conformity with the provisions and requirements of IGRA, including those provisions regarding the obligation of the State to negotiate in good faith and the enforcement of that obligation in federal court. The Chairperson of the Tribe and the Governor of the State are hereby authorized to designate the person or agency responsible for conducting the negotiations, and shall execute any documents necessary to do so.

Section 12.4. The Tribe shall have the right to terminate this Compact in the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a state statute or constitutional provision, or the conclusive and dispositive judicial construction of a statute or the state Constitution by a California appellate court after the effective date of this Compact, that Gaming Devices may lawfully be operated by another person, organization, or entity (other than an Indian tribe pursuant to a compact) within California.

Section 13.0. NOTICES

Unless otherwise indicated by this Gaming Compact, all notices required or authorized to be served shall be served by first-class mail at the following addresses:

Governor                        Tribal Chairperson
State Capitol                   *1
Sacramento, California 95814    *4

41

2426

## Section 14.0.  CHANGES IN IGRA

This Gaming Compact is intended to meet the requirements of IGRA as it reads on the effective date of this Gaming Compact, and when reference is made to the Indian Gaming Regulatory Act or to an implementing regulation thereof, the referenced provision is deemed to have been incorporated into this Compact as if set out in full.  Subsequent changes to IGRA that diminish the rights of the State or the Tribe may not be applied retroactively to alter the terms of this Gaming Compact, except to the extent that federal law validly mandates that retroactive application without the State's or the Tribe's respective consent

## Section 15.0.  MISCELLANEOUS

Section 15.1.  Third Party Beneficiaries.  Except to the extent expressly provided under this Gaming Compact, this Gaming Compact is not intended to, and shall not be construed to, create any right on the part of a third party to bring an action to enforce any of its terms.

Section 15.2.  Complete agreement; revocation of prior requests to negotiate.  This Gaming Compact, together with all addenda and approved amendments, sets forth the full and complete agreement of the parties and supersedes any prior agreements or understandings with respect to the subject matter hereof.

Section 15.3.  Construction.  Neither the presence in another tribal-state compact of language that is not included in this Compact, nor the absence in this Compact of language that is present in another tribal-state compact shall be a factor in construing the terms of this Compact.

Section 15.4.  Most Favored Tribe.  If, after the effective date of this Compact, the State enters into a Compact with any other tribe that contains more favorable provisions with respect to any provisions of this Compact, the State shall, at the Tribe's request, enter into the preferred compact with the Tribe as a superseding substitute for this Compact; provided that the duration of the substitute compact shall not exceed the duration of this Compact.

Section 15.5.  No 15.5 in the document.

42

2427

**Section 15.6. Representations.** By entering into this Compact, the Tribe expressly represents that, as of the date of the Tribe's execution of this Compact:

(a) the undersigned has the authority to execute this Compact on behalf of his or her tribe and will provide written proof of such authority and ratification of this Compact by the tribal governing body no later than October 9, 1999;

(b) the Tribe is

(i) recognized as eligible by the Secretary of the Interior for special programs and services provided by the United States to Indians because of their status as Indians, and

(ii) recognized by the Secretary of the Interior as possessing powers of self-government. In entering into this Compact, the State expressly relies upon the foregoing representations by the Tribe, and the State's entry into the Compact is expressly made contingent upon the truth of those representations as of the date of the Tribe's execution of this Compact. Failure to provide written proof of authority to execute this Compact or failure to provide written proof of ratification by the Tribe's governing body will give the State the opportunity to declare this Compact null and void.

IN WITNESS WHEREOF, the undersigned sign this Compact on behalf of the State of California and the * 1.

Done at Sacramento, California, this 10th day of September 1999.:
STATE OF CALIFORNIA
By Gray Davis
Governor of the State of California

By *5
Chairperson of the * 1

43

000058

2428

## TRIBAL-STATE GAMING COMPACT
### INDEX

| | |
|---|---|
| Alcoholic Beverages | 6.3(b), 10.2(i), 10.5 |
| Arbitration Rules | 9.2 |
| Association, Defined | 2.2 |
| Audits | |
| - Regulations Governing | 8.1.8 |
| - Quarterly Contributions | 5.3(d) |
| Authorized Gaming Activities | 1.0(b), 2.4, 3.0, 4.1 |
| Building Expansion/Modification | 6.4.2(b), 10.8.2(c) |
| California Law Enforcement Technical Services (CLETS) | 6.4.8 |
| Cheating | 8.1.6 |
| Compact, Terms of | |
| - Amendment | 12.1, 12.3, 15.2 |
| - Effective Date | 11.2.1 |
| - Most Favored Tribe | 15.4 |
| - Renegotiation of Terms | 4.1(e), 12.2, 12.3 |
| - Scope of | 4.0 |
| - Termination | 11.2.1, 12.4 |
| Compliance | |
| - Access to Premises | 7.4 |
| - Breach of Compact | 11.2.1(c) |
| - Fines | 7.2 |
| - Inspection of Premises | 7.4.1, 7.4.2, 10.2(e) |
| - Inspection of Records | 7.4.3(a) |
| - On-site Regulation | 7.1 |
| - Sanctions for Non-Compliance | 7.2 |
| Denial, Suspension, Revocation | 6.4.9, 6.5.1, 6.5.5, 6.5.6 |
| Dispute Resolution | 9.0 |

44

| | |
|---|---|
| Enrolled Member, Definition | 6.4.4(d)(iii) |
| Exclusion Lists | 8.1.7 |
| Fees, Application | 6.5.6 |
| Financial Sources | 6.4.6 |
| Fingerprints | 6.5.6(a)(ii) |
| **Funds** | |
| - Distribution to Non-Compact Tribes | 4.3.2.1(a), (b), 5.1(a) |
| - Revenue Sharing Trust Fund | 4.3.2(a)(ii), 4.3.2.1, 4.3.2.2 |
| - Special Distribution Fund | 4.3.2(a)(iii), 5.1(a), 5.2 |
| - Use of | 5.2 |
| **Gaming Devices** | |
| - Authorized Number | 4.3 |
| - Definition | 2.6 |
| - Licenses | 4.3.2.2 |
| - Repair | 7.4.5(b) |
| - Technical Standards/Specifications | 8.1.14 |
| - Transportation | 7.4.5, 8.1.3 |
| - Payout Determination | 8.1.10(a)(b) |
| - Quarterly Device Base | 5.1(a) |
| **Gaming Facilities** | |
| - Authorized Number/Location | 4.2 |
| - Expansion/Modifications | 6.4.2(b), 10.8.2(c) |
| - Inspection | 6.4.2(c)(d) |
| - License Requirements | 6.4.2(a) |
| - Posting of License | 6.4.2 |
| Gaming Operation, Defined | 2.9 |
| **Gaming Operations** | |
| - Cashier's Cage | 8.1.12 |
| - Cheating | 8.1.6 |
| - Check Cashing | 10.2(h) |
| - Extension of Credit | 10.2(j) |
| - Odds of Play | 8.1.10(a)(b) |
| - Patron Disputes | 8.1.10(d) |
| - Payout Determination | 8.1.10(a)(b) |

45

2430

- Wagering Limits                                8.1.10(c)

Gaming Resources
- Definition                                     2.11
- Suppliers, License Requirement                 6.4.5

Identification Cards (Badges)                    6.5.3, 6.5.6(c)

Information/Records
- Confidentiality                                6.4.8, 7.4.3(b)(i)
- Disclosure                                     7.4.3
- Property of the Tribe                          7.4.3(a)
- Release to Law Enforcement Agencies            7.4.3(b)(ii)

Inspections
- Premises                                       7.4.1, 7.4.2, 10.2(c)
- Records                                        7.4.3(a)

Jurisdiction
- State Civil                                    8.2
- State Criminal                                 8.2

Licenses (Devices)
- Allocation                                     4.3.2.2
- Fees                                           4.3.2.2(e)
- Grants                                         5.2
- Quarterly Contributions                        4.3.2.3, 5.1, 5.3

Licensing
- Background Investigations                      6.4.8, 6.5.2, 6.5.6(b)
- Business Entities                              6.4.7
- Conditional                                    6.5
- Denial, Suspension, Revocation                 6.4.9, 6.5.1, 6.5.5, 6.5.6
- Enrolled Members                               6.4.4(d)
- Exceptions                                     6.4.3(c), 6.4.4(c), 6.4.6
- Facility                                       6.4.1(a)
- Financial Sources                              6.4.6
- Gaming Devices                                 4.3.2.2
- Gaming Employees                               6.4.4
- Gaming Resources Suppliers                     6.4.5, 6.4.6
- Issuance                                       6.5
- Renewal                                        6.4.2, 6.4.4, 6.4.5, 6.5.2
- Suitability Standard                           6.4.3, 6.4.4, 6.4.8, 6.5.6

2431

- Summary of Principles            6.4.1
- Temporary Licenses           6.4.4, 6.4.8, 6.4.9, 6.5.6(a)

Internal Revenue Service
- Reporting Requirements      10.2(k)

Management Contractor, Definition     2.14

Minors, Prohibition          6.3(a)

Net Win
- Average                5.3
- Definition             2.15, 5.1(a)

Notices, Service of          13.0

Off-Track Wagering          4.1(e)

Public Health and Safety
- Building Standards        6.4.2(b), 10.2(c)
- Check Cashing          10.2(b)
- Conflict of Interest       8.3
- Drinking Water Quality    10.2(b)
- Emergency Services
  (Fire, Medical, etc.)      10.4
- Environmental Impact    10.8
- Exclusion Lists        8.1.7
- Expansion/Building Modifications  6.4.2(b)
- Extension of Credit      10.2(j)
- Firearms             10.6
- Food and Beverage Standards   10.2.(a)
- Labor Relations        10.7
- Liability Insurance      10.2(d)
- Patron Disputes        8.1.10(d)
- Patron/Employee Safety   8.1.2
- Work-Related Injuries     10.3

Quarterly Contributions     4.3.2.3, 5.1, 5.3

000062

2432

Records/Information
  - Confidentiality   6.4.8, 7.4.3(b)(i)
  - Disclosure   7.4.3
  - Property of the Tribe   7.4.3(a)
  - Release to Law Enforcement Agencies   7.4.3(b)(ii)

Regulations
  - Approval by Association   8.4.1(b)
  - Consistency with State   8.4
  - Emergency Regulations   8.4.1(d)
  - Minimum Requirements   8.1

Security
  - Cashier's Cage   8.1.12
  - Closed Circuit Surveillance System   8.1.4, 8.1.11
  - Recording Incidents at Facility   8.1.5

Suitability   6.4.3, 6.4.4, 6.4.8m 6.5.6

Tribal Gaming Agency
  - Ability to Receive State Summary
    Criminal History Information   6.4.8
  - Background Investigation   8.3(b)
  - Defined   2.20
  - License Requirement   6.4.4
  - Members   8.3(a)
  - Removal for Improper Conduct   8.3(a)

Tribal-State Gaming Association   2.2

Wagering Limits   8.1.10(c)

000063

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

AVERY™

**SUM-100**

## SUMMONS
### (CITACION JUDICIAL)

| | |
|---|---|
| NOTICE TO DEFENDANT:<br>(AVISO AL DEMANDADO):<br><br>THE CALIFORNIA GAMBLING CONTROL COMMISSION; and DOES 1-50, Inclusive | **FOR COURT USE ONLY**<br>**(SOLO PARA USO DE LA CORTE)**<br>CIVIL BUSINESS OFFICE 9<br><br>2008 JAN -8 P 3: 26<br><br>CLERK... COURT<br>S?... CA |

YOU ARE BEING SUED BY PLAINTIFF:
(LO ESTÁ DEMANDANDO EL DEMANDANTE):

CALIFORNIA VALLEY·MIWOK TRIBE

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is:<br>(El nombre y dirección de la corte es): | CASE NUMBER:<br>(Número del caso): 37-2008-00075326-CU-CO-CTL |
|---|---|
| Superior Court of California<br>330 West Broadway<br>San Diego, CA 92101<br><br>Central Division | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Manuel Corrales, Jr., Esq. SBN 117647          858.521.0634     858.521.0633
11753 Avenida Sivrita
San Diego, CA 92128

| DATE: JAN 0 8 2008<br>(Fecha) | Clerk, by  S. Dyson<br>(Secretario) | , Deputy<br>(Adjunto) |
|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☒ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☒ on behalf of (specify): The California Gambling Control Commission

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

000064

**EXHIBIT 3**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Manuel Corrales, Jr., Esq., SBN 117647<br>11753 Avenida Sivita<br>San Diego, CA 92128 | CIVIL BUSINESS OFFICE 9<br>CENTRAL DIVISION<br><br>2008 JAN -8 P 3: 27<br><br>CLER... |

TELEPHONE NO. 858.521.0634    FAX NO.: 858.521.0633
ATTORNEY FOR (Name): California Valley Miwok Tribe

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
 STREET ADDRESS: 330 West Broadway
 MAILING ADDRESS:
 CITY AND ZIP CODE: San Diego, CA 92101
 BRANCH NAME: Central District

CASE NAME: California Valley Miwok Tribe v. The
California Gambling Control Commission

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 37-2008-00075326-CU-CO-CTL<br>JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [X] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
 a. [ ] Large number of separately represented parties
 b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
 c. [ ] Substantial amount of documentary evidence
 d. [ ] Large number of witnesses
 e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
 f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [ ] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [ ] punitive

4. Number of causes of action (specify): 5

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: January 7, 2008

Manuel Corrales, Jr., Esq., SBN 117647 ▶ _(signature)_
_____(TYPE OR PRINT NAME)_____    _(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)_

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**   Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

000065

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

AVERY™

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:    330 West Broadway
MAILING ADDRESS:    330 West Broadway
CITY AND ZIP CODE:    San Diego, CA 92101
BRANCH NAME:    Central
TELEPHONE NUMBER:    (619) 685-6025

PLAINTIFF(S) / PETITIONER(S):    California Valley Miwok Tribe

DEFENDANT(S) / RESPONDENT(S):    The California Gambling Control Commission

CALIFORNIA VALLEY MIWOK TRIBE VS. THE CALIFORNIA GAMBLING CONTROL COMMISSION

| NOTICE OF CASE ASSIGNMENT | CASE NUMBER:<br>37-2008-00075326-CU-CO-CTL |
|---|---|

Judge:  Joan M. Lewis                                      Department: C-65

COMPLAINT/PETITION FILED: 01/08/2008

---

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

---

Page: 1

SDSC CIV-721 (Rev. 11-06)                    **NOTICE OF CASE ASSIGNMENT**

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **California Valley Miwok Tribe v. California Gambling Control Commission**

Case No. **United State District Court, Southern District, Case No. _____**
**State Court No. 37-2008-00075326-CU-CO-CTL**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **January 22, 2008**, I served the attached:

**NOTICE OF REMOVAL OF CIVIL ACTION**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 110 West A Street, Suite 1100, P.O. Box 85266, San Diego, CA 92186-5266, addressed as follows:

Manuel Corrales, Jr.
Attorney at Law                                          Clerk of Superior Court
11753 Avenida Sivrita                                Superior Court of California
San Diego, CA 92128                              330 West Broadway
*Attorney for Plaintiff*                              San Diego, CA 92101
CALIFORNIA VALLEY MIWOK TRIBE

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **January 22, 2008**, at San Diego, California.

Roberta L. Matson
_____                          _____
Declarant                                                      Signature

80197651.wpd

JS 44 (Rev. 11/04)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED

**I. (a)  PLAINTIFFS**

CALIFORNIA MIWOK TRIBE

**DEFENDANTS**

THE CALIFORNIA GAMBLING CONTROL COMMISSION; and
DOES 1 THROUGH 50, inclusive

**(b)**  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

'08 CV 0120 BEN AJB

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Manuel Corrales, Jr., Attorney at Law 858.521-0634
11753 Avenida Sivrita

Attorneys (If Known)

EDMUND G. BROWN, JR., California Attorney General
Robert L. Mukai

| **II. BASIS OF JURISDICTION** (Place an "X" in One Box Only) | | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|---|

(For Diversity Cases Only)

| | | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| | | | Citizen or Subject of a Foreign Country ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC Sections 1331, 1362

Brief description of cause:
Breach of Tribal-State Class III Gaming Compact

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE  1/22/08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  146701   AMOUNT $350   1/22/08 BY   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**#  146701    — BH**

**January 22, 2008
15:34:55**

**Civ Fil Non—Pris**
USAO #.: O8CV0120 CIVIL FILING
Judge..: ROGER T BENITEZ
Amount.:                    $350.00 CK
Check#.: CACK#175-300511

**Total—>   $350.00**

FROM: CA MIWOK TRIBE V. CA GAMBLING
        CONTROL COMMISSION
        CIVIL FILING